# IN THE SUPREME COURT OF TEXAS

═══════════
No. 17-0046
═══════════

SCRIPPS NP OPERATING, LLC, A WISCONSIN LIMITED LIABILITY COMPANY,
SUCCESSOR IN INTEREST TO SCRIPPS TEXAS NEWSPAPERS, LP D/B/A CORPUS
CHRISTI CALLER-TIMES, PETITIONERS,

v.

TERRY CARTER, RESPONDENT

═══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════

**Argued February 20, 2019**

JUSTICE DEVINE delivered the opinion of the Court.

At issue in this interlocutory appeal is whether a newspaper was entitled to summary judgment in a defamation case. The former chief executive officer of the Corpus Christi Chamber of Commerce sued the *Corpus Christi Caller-Times*, asserting that articles reporting he had been accused of financial improprieties were defamatory. The Newspaper filed a motion for summary judgment claiming that the allegedly defamatory articles were substantially true and that an editorial was protected opinion. The trial court disagreed and denied the Newspaper's motion. The Newspaper filed an interlocutory appeal. The court of appeals agreed with the trial court that the

Newspaper was not entitled to summary judgment on those grounds. 567 S.W.3d 1, 20–21 (Tex. App.—Corpus Christi–Edinburg 2016).

In this Court, the Newspaper again asserts that the trial court should have granted summary judgment because the articles at issue were substantially true. It argues that no fact issue regarding substantial truth exists because it accurately reported the allegations of others and because statements in an editorial, which tied together the previous reporting, were non-actionable opinions. Because we agree with the court of appeals that the Newspaper was not entitled to summary judgment, we affirm.

## I. Background

Terry Carter began working for the Corpus Christi Chamber of Commerce (chamber) as the president and CEO in 2004. On February 15, 2008, the Newspaper published an article online entitled "Financial, management questions raised at CC Chamber." The article stated that three chamber officials "raised what they describe as serious financial and management issues." No chamber officials would discuss the nature of the issues, but the concerns arose after the chamber chairman-elect "recommended a raise, bonus and contract extension for Carter" and the executive committee treasurer, Damon Bentley, was asked to review the chamber's financial standing. The article also noted that an emergency meeting had taken place that day from which Carter could be heard shouting.

The next day, the Newspaper printed another article in the print version of the newspaper with additional details about the meeting the day before. The article stated that three of the chamber's five executive committee members had demanded the meeting to address concerns about

2

the chamber's "financial and management practices, which Carter oversees." But before the meeting started, two of those members were informed that they were no longer eligible to serve on the committee, "meaning they can't participate in the committee's recommendation to the full board on matters involving Carter's contract." The Newspaper quoted Bentley as saying "I was saddened and I'm still confused on why two chamber executive board members had been removed from the executive committee after being asked to assist in the evaluation process of our CEO." The article again noted that the "financial concerns" arose after a raise, bonus, and contract extension were recommended for Carter.

Over the next four months, the Newspaper published over twenty more articles about the chamber and Carter. The next article was entitled "CC Chamber meeting to discuss financial irregularities" and stated that irregularities were discovered "during a performance review of president Terry Carter after a raise and bonus for Carter had been proposed." The Newspaper next reported on a special called meeting, stating that the chamber decided to conduct a full audit "after what have been described as financial irregularities were uncovered while reviewing a proposed raise and bonus for . . . Carter." The article also noted "significant developments" about two of three executive committee members who brought the financial concerns to the full committee's attention and were informed by Carter and the chamber's attorney that they were no longer eligible to serve on the committee.

The headline of the next article was "Chamber CEO shifted funds, letter says," with the subtitle "Move makes loss appear to be profit, treasurer writes." The article reported on a letter from Bentley to board members and stated that Carter, "whose bonus is based on financial performance,

3

shifted funds to make a loss look like a profit, according to [the] letter." The letter also stated that Carter deferred part of his salary and that the chamber executive vice president was also asked to defer his salary because the chamber was in a "cash crunch" and the chamber "showed a $40,425 profit when it should have shown a $61,782 loss." According to Bentley's letter, Carter also used $18,312 from the chamber's building funds to pay operating expenses which, according to the chamber's accountant, could "possibly forfeit the (chamber) foundation's (nonprofit) status because of the link between the CEO's bonus to the financial performance of the chamber." The article described the February 15 meeting of the executive committee as including "a shouting match with Carter and the dismissal of two committee members" and stated that, according to Bentley's letter and witness accounts, Carter "seized" the tape recording of the meeting and left the building. The article quoted from Bentley's letter: "In the end . . . this comes down to trust and accountability. Removing executive committee members who voice sincere concerns, keeping taped meetings from other board members, yelling in an attempt to intimidate board volunteers . . . and attempting to justify a raise based on disputable numbers do not change my fiduciary responsibility." The article reported that Carter, also in a letter to board members, said that he deferred part of his salary for tax purposes and that the failure to record the deferral was a bookkeeping error. Carter also stated in the letter that he had discussed moving funds from the chamber's building funds with Bentley and the chamber's accountant before he did so.

In another article, the Newspaper reported on a letter to board members from one of the board members who had been removed. She had concerns the Chamber had not taken sufficient steps to address the financial concerns raised by Bentley and that Carter's letter to board members

4

"gloss[ed] over financial irregularities and the declining membership numbers." The article again noted that Carter "seized" the tape of the February 15 meeting and shouted at the board members who were removed that day. The article also stated that after Bentley reviewed the chamber's finances in anticipation of a raise, bonus, and contract extension for Carter, "Bentley found that Carter had shifted funds among accounts and deferred $19,992 of his 2007 salary. Without those moves, the chamber's cash flow would have been negative, according to Bentley, adding that Carter's bonus is based on the chamber's financial performance." The article additionally said that according to Bentley, the chamber's accountant told him that "the chamber foundation's nonprofit status could be in jeopardy because Carter shifted chamber foundation funds to pay operating expenses and Carter's bonus is linked to the chamber's financial performance."

On March 2, 2008, the Newspaper published an editorial with the headline "Chamber CEO's actions raise serious questions," and a subtitle stating "Funds were shifted that made a loss look like a profit, entitling CEO to a bonus." The unsigned editorial stated that the Newspaper had resigned from the chamber the prior year, a decision prompted by "the divisive leadership of Terry Carter" because the Newspaper could not be part of an organization whose president "engages in name calling and shows favoritism toward one business over another." The editorial noted that reports of "highly questionable stewardship of the financial affairs of the chamber by Carter" had been laid out in a series of stories and that these "news accounts describe duplicitous dealings by Carter in his relations with the membership and the executive committee." It stated that a letter by Bentley laid out "the questionable shifting of funds" and "[t]he fund shifting, including the deferring of Carter's salary, allowed the chamber to show a profit, thus qualifying Carter for a bonus." The editorial

5

stated that Carter had explained he had discussed using chamber foundation money for operating expenses with the chamber accountant, but that the accountant had "warned that the use of foundation money in such a way would threaten the chamber's nonprofit status." The editorial closed with

> The chamber can be an effective and creditable voice for the business community only if its leadership conducts itself in an ethical and professional manner, accountable to its members and holding itself to the same businesslike standards that its members expect of themselves. Intimidation, secrecy and duplicity discredit a vital organization. The question mark remains over Carter until he fully explains his actions, or until the chamber chooses to move on without him.

After the editorial, the Newspaper published additional articles regarding chamber members signing a petition for the chamber to address the financial practices and provide membership rosters, and the chamber meetings held to address those concerns. The Newspaper also reported on the chamber putting Carter on paid leave and his eventual resignation and severance agreement. Finally, the Newspaper published articles regarding a lawsuit filed by Carter against the chamber and Bentley and court proceedings related to the tape of the February 15 meeting.

Six months after the articles were published, an outside accounting firm completed an audit of the chamber's finances. The audit stated that "[t]he staff-prepared financial statements had material misstatements. The misstatements are due to omissions, accounting applications and or lack of current accounting requirements." The audit also noted that the "misstatements" had been "corrected by management."

Carter filed suit against Scripps Texas Newspapers (the predecessor in interest to Scripps NP Operating, LLC) d/b/a *Corpus Christi Caller-Times* for (1) tortious interference with a contract,

6

(2) tortious interference with prospective relationship, (3) defamation, and (4) conspiracy. He asserted that the Newspaper published false statements about him alleging wrongful and deceitful conduct by engaging in financial and managerial irregularities to obtain an undeserved bonus and as a result, he suffered loss of employment and past and future income. The Newspaper filed a combined motion for traditional and no-evidence summary judgment, arguing that there was no evidence of actual malice, which the Newspaper alleged to be an element of Carter's defamation claims because he was a public figure. The Newspaper also asserted that in the absence of actual malice, Carter's non-defamation claims failed. The trial court denied the motion, and the Newspaper pursued an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6) (permitting an interlocutory appeal from the denial of a motion for summary judgment by a member of the media "arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73 [of the Texas Civil Practice and Remedies Code]").

The court of appeals affirmed the trial court's order denying the Newspaper's motion for summary judgment. *Scripps Tex. Newspaper, LP v. Carter*, 13-09-00655-CV, 2012 WL 5948955, at *8 (Tex. App.—Corpus Christi–Edinburg Nov. 21, 2012, pet. denied).[1] The court concluded Carter was not required to prove the Newspaper's actual malice because he was not a public figure. *Id.* at *5. The court then affirmed the denial of the Newspaper's summary-judgment motion,

---

[1] Carter's suit also joined the chamber, Bentley and other former executive committee members as defendants. The court of appeals found the former executive committee members were entitled to summary judgment and rendered judgment for them in that appeal. *Id.* at *7–8. Bentley did not file a brief so the court dismissed his appeal for want of prosecution. *Id.* at *1 n.1. Bentley was no longer listed as a party in the trial court after remand. The chamber has not been a party to these appeals.

7

concluding that fact issues remained regarding the Newspaper's liability for publishing allegedly defamatory statements. *Id.* at *7–8.

On remand, the Newspaper filed a second motion for summary judgment on traditional and no-evidence grounds. This time it argued that the articles were (1) true, (2) not defamatory, (3) non-actionable opinion, (4) privileged as fair reports of judicial proceedings, and (5) published without negligence or actual malice. The Newspaper also asserted there was no evidence to support Carter's non-libel claims. The trial court again denied the Newspaper's motion for summary judgment, and the Newspaper filed a second interlocutory appeal. The court of appeals agreed with the Newspaper that there was no evidence supporting Carter's non-defamation claims and rendered judgment granting the Newspaper's motion for summary judgment as to those claims. 567 S.W.3d at 26. The court also held that the relevant articles were protected by the fair-report privilege, *id.* at 21, and that there was no evidence of actual malice as to any of the articles. *Id.* at 25. But the court concluded the articles were defamatory. *Id.* at 18. The court further concluded that the Newspaper failed to establish that the articles were published without negligence, *id.* at 24–25, or that the editorial was non-actionable opinion. *Id.* at 21. Finally, the court concluded that the Newspaper failed to conclusively prove that the gist of the articles was substantially true. *Id.* at 20. The court rejected the Newspaper's claim that the articles were substantially true reports of allegations, observing that the statements went beyond mere "allegation reporting." *Id.*

In this Court, the Newspaper challenges the court of appeals conclusion as to the substantial truth of the statements at issue. The Newspaper claims that it accurately reported third-party allegations against Carter, meeting the substantial truth test, and additionally that there are no fact

8

issues regarding substantial truth. The Newspaper also asserts that the court of appeals incorrectly determined that the editorial was not a protected expression of opinion. And finally, the Newspaper argues that the court of appeals erred by analyzing the multiple publications at issue together rather than individually to determine the gist of the articles.

## II. Jurisdiction

We first consider Carter's challenge to our jurisdiction, claiming that we lack jurisdiction over this second interlocutory appeal because the Newspaper's second motion for summary judgment is essentially an untimely motion for rehearing raising issues that were, or could have been, raised in the Newspaper's first interlocutory appeal. While Texas appellate courts generally only have jurisdiction over appeals from final judgments, they do have jurisdiction over appeals from interlocutory orders when authorized by statute. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 92 (Tex. 2012) (citing TEX. CIV. PRAC. & REM. CODE § 51.014(a)). The Civil Practice and Remedies Code provides that "a person may appeal from an interlocutory order" that

> denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73 [of the Texas Civil Practice and Remedies Code].

TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6).

Carter asserts that section 51.014 does not authorize multiple interlocutory appeals by the same party in one case. He contends that the statutory language providing that "[a] person may appeal from an interlocutory order . . . that denies a motion for summary judgment" does not permit

9

an appeal from *any* interlocutory order that denies a second motion for summary judgment. *See id.*
We disagree that the statute restricts interlocutory appeals in this way.

In *City of Houston v. Estate of Jones*, 388 S.W.3d 663 (Tex. 2012) (per curiam), we addressed whether the City of Houston was entitled to a second appeal under section 51.014(a)(8), which permits an interlocutory appeal from an order that grants or denies a plea to the jurisdiction by a governmental unit. We concluded the court of appeals did not have jurisdiction over the second appeal because the City did not raise any new issues in its second plea to the jurisdiction so it was substantively a motion to reconsider. *Id.* at 667. In a later case, we explained that "[u]nder *Jones*, the touchstone of our analysis was whether the later plea to the jurisdiction was a new and distinct motion or a mere motion to reconsider." *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017) (per curiam). And in that case, we concluded that because the second motion was sufficiently different from the first, it merited an independent interlocutory appeal. *Id.* at 302.

Even though the interlocutory appeals in this case are under subsection 51.014(a)(6), the same analysis applies—a court has jurisdiction over a subsequent appeal if the second motion is a new and distinct motion and not a mere motion to reconsider previous grounds for summary judgment. *See id.* Carter asserts that the Newspaper's second motion was a motion for rehearing because it raised the same category of issues as its first motion—First Amendment issues. We disagree that the Newspaper's second motion was a motion to reconsider and not a distinct motion.

In its first motion for summary judgment, the Newspaper asserted (1) the evidence established as a matter of law that Carter was a public figure, (2) there was no evidence that the

10

Newspaper published the articles at issue with actual malice, an essential element of Carter's defamation claims because of Carter's public-figure status, and (3) in the absence of malice, Carter's non-defamation claims also failed. The trial court denied the motion and the court of appeals affirmed, holding that Carter was not a public figure. *Scripps Tex. Newspaper, LP v. Carter*, 2012 WL 5948955, at *1, 5, 8. In contrast, the Newspaper argued in its second motion that the articles at issue were (1) substantially true, (2) non-actionable opinion, (3) privileged as fair reports of judicial proceedings, (4) published without negligence or malice, and (5) not defamatory. Although the second motion raised issues related to the First Amendment, it raised new and distinct grounds for relief, which entitled the Newspaper to further interlocutory review. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6).

Carter invites us to set a clear jurisdictional boundary of only one interlocutory appeal under section 51.014(a). Otherwise, Carter claims, the floodgates will be open to multiple interlocutory appeals in every case where that section applies. But nothing in the statutory language limits a party to only one appeal. We decline to read a limitation in the statute that the Legislature has not provided. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 629 (Tex. 2008) ("[O]ur standard is to construe statutes to effectuate the intent of the Legislature, with the language of the statute as it was enacted to be our guide.").

We next turn to the merits of the case.

### III. Defamation

The First Amendment to the United States Constitution and Article I, Section 8 of the Texas Constitution guarantee the people a right to a free press. U.S. CONST. amend. I; TEX. CONST. art. I,

11

§ 8.  The open courts provision of the Texas Constitution also guarantees that "every person for an injury done him, in his . . . reputation, shall have remedy by due course of law."  TEX. CONST. art. I, § 13.  Nearly 100 years ago, this Court said, "The purpose of [section 8] is to preserve what we call 'liberty of speech' and 'the freedom of the press,' and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom."  *Ex parte Tucker*, 220 S.W. 75, 76 (Tex. 1920).  The tort of libel has been part of our common law tradition since the sixteenth century, and our courts have grappled with the proper balance between this tradition and the protection of First Amendment freedoms for many decades.  *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265–66 (1964); *Ex parte Tucker*, 220 S.W. at 76.  In a defamation case, when the defendant is a media outlet and the plaintiff is a private citizen (not a public official or public figure), the plaintiff must prove (1) a publication by the defendant, (2) that defamed the plaintiff, and (3) which was published negligently with regard to the truth.  *Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013).  As we explained in *Neely*, these elements are consistent with the United States Supreme Court's application of constitutional principles to defamation claims.  *See id.*

### A. Standard of Review

We review the denial of a motion for summary judgment de novo.  *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018).  The party moving for summary judgment, here the Newspaper, bears the burden of proof.  *Neely*, 418 S.W.3d at 59.  The Newspaper sought summary judgment on traditional and no-evidence grounds and while the burdens vary for the different types of motions, both parties presented summary judgment evidence.  *See id.*  Therefore, the "differing

12

burdens are immaterial and the ultimate issue is whether a fact issue exists." *Id.* (citing *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012)). We review the evidence in the light most favorable to the nonmovant and indulge every reasonable inference and resolve any doubts against the motion. *Id.* at 59–60 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). These summary judgment standards of review are not affected by the constitutional concerns over defamation. *Id.* at 60.

## B. Consideration of Multiple Articles

In the court of appeals, the Newspaper asserted that the articles were not defamatory. The court of appeals disagreed, finding "the impression left by the articles *taken together* is certainly one which a reader of ordinary intelligence could perceive as defamatory." 567 S.W.3d at 17 (emphasis added). The court concluded that the articles implicitly suggested that Carter committed theft and made false statements to obtain property. *Id.* at 18. The court also found that the articles collectively reported that Carter misrepresented the chamber finances for his own financial gain, "seized" a tape recording of a meeting, and attempted to intimidate his critics, all of which were directly relevant to his fitness to serve as CEO of a non-profit organization. *Id.* The Newspaper argues that a court must treat each article as a separate and distinct publication in assessing its defamatory impact and the court of appeals erred by considering the articles together. Carter responds that the Newspaper published these articles as a series and defamation must be considered in context, which includes all instances of publication. We agree with Carter that the court of appeals correctly analyzed the multiple articles together to assess whether the publications were defamatory.

13

To establish the defamatory meaning of a publication, courts analyze the gist of the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)) (citing *Neely*, 418 S.W.3d at 63). In *Bentley v. Bunton*, we ruled that statements made by the host of a call-in talk show were defamatory after considering statements he made on public access television over a nearly eight-month span. 94 S.W.3d 561, 581, 602 (Tex. 2002). Similarly, the court of appeals correctly considered all the articles together to determine whether they were defamatory. The Newspaper's editorial itself characterizes the articles in this case as a "series," and all of the articles reported on the same subject matter—financial irregularities at the chamber linked to Carter's entitlement to a bonus and Carter's attempts to intimidate his critics. The court of appeals could not make a proper assessment of the alleged defamatory material in this case without looking at the "surrounding circumstances" encapsulated in this series. *See Turner*, 38 S.W.3d at 114. Accordingly, we hold the court of appeals did not err by considering the entire series of articles for the purposes of assessing their defamatory meaning.

### C. Substantial Truth

The Newspaper next argues it was entitled to summary judgment because the alleged defamatory material it published was substantially true as a matter of law. "The truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX. CIV. PRAC. & REM. CODE §73.005(a). The Newspaper claims the statements were substantially true based on two grounds: (1) the Newspaper merely reported third-party allegations against Carter and

14

did so accurately, and (2) there is no evidence that raises a fact issue on substantial truth. Because this is an appeal from the denial of a motion for summary judgment, we consider whether there is a fact issue regarding the substantial truth of the statements at issue.

### 1. Reporting Allegations

The Newspaper argues it cannot be liable for defamation for accurately reporting the allegations of chamber members because it is true that these third parties made the allegations of impropriety against Carter. Carter asserts that the Newspaper waived this issue because it was not presented to the trial court in its motion for summary judgment, but we disagree. The Newspaper argued in its motion for summary judgment that statements in the articles regarding allegations that had been made against Carter were substantially true. Although the Newspaper did not label the statements as "accurate reporting of allegations," it nevertheless presented the issue to the trial court. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). The issue therefore has not been waived.

Carter next responds that because we have never recognized an allegation-reporting privilege, and because the dispute here is not a matter of public concern, the ordinary rules for defamation liability should apply, including equal liability for anyone who republishes defamatory material of an original speaker. *See Neely*, 418 S.W.3d at 61(citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973)). The Legislature addressed this issue in 2015 by amending section 73.005 of the Civil Practice and Remedies Code to read, "In an action brought against a newspaper or other periodical or broadcaster, the defense [of truth] applies

15

to an accurate reporting of allegations made by a third party regarding a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 73.005(b). This amendment, however, does not apply to this dispute because it was passed after Carter filed this defamation suit against the Newspaper. *See* Act of May 15, 2015, 84th Leg., R.S., ch. 191, § 1, sec. 73.005(b), 2015 Tex. Gen. Laws 1260.

We are nevertheless urged by the Newspaper and an amicus[2] to adopt a parallel common law rule that would operate to shield the Newspaper from liability for accurately reporting the allegations of the chamber members. In *Neely*, we were asked to adopt a similar rule to "shield media defendants from defamation liability for publishing third-party allegations if the defendants show that the underlying allegations (1) were made, and (2) were accurately reported." 418 S.W.3d at 64. We declined to adopt such a rule, concluding instead that a genuine issue of material fact existed in that case as to whether the broadcast at issue accurately reported on an investigation. *Id.* at 65. We did not, however, "foreclose the possibility that the gist of some broadcasts may merely be allegation reporting, such that one measure for the truth of the broadcast could be whether it accurately relayed the allegations of a third party." *Id.*

Both parties also cite *Global Relief Foundation, Inc. v. New York Times Co.*, 390 F.3d 973 (7th Cir. 2004), as pertinent to whether the allegation-reporting privilege should apply here. In that case, Global Relief Foundation claimed that various news outlets defamed it by falsely reporting the charity financed terrorism around the time of the September 11 attacks. *Id.* at 975. The court found the gist of the defendants' publications was not that Global Relief was funding terrorism, but

---

[2] An amicus brief was submitted by Texas Press Association, Texas Association of Broadcasters, and Freedom of Information Foundation of Texas.

16

only that it was being investigated for such crimes. *Id.* at 986–87. The court rejected Global Relief's assertion that the defendants were required to prove the truth of the charges before reporting on the investigations. *Id.* at 987. Instead, it concluded that the defendants were entitled to summary judgment because all of the reports about the government's investigations were true or substantially true. *Id.* at 986–87.

The Newspaper argues that this case is similar to *Global Relief* because all the Newspaper did was report on allegations made by chamber members and that it should not be charged with proving those allegations as true before reporting on them. Carter responds that this case is distinguishable from *Global Relief* because there was no government investigation and the gist of the underlying allegations was not true.

Because we agree with the court of appeals that the reporting here went beyond merely restating the allegations of a third party and instead adopted a gist that the substance of the allegations was itself true, as we did in *Neely* we leave open the question of whether the common law recognizes a substantial truth defense for accurately reporting third-party allegations. *See* 567 S.W.3d at 19–20 (citing *Global Relief*, 390 F.3d at 983). The Newspaper published several articles detailing allegations that Carter shifted funds to make the chamber appear profitable when it was not, shouted at board members who raised financial concerns, and even succeeded in removing some antagonistic members. In several of these articles the Newspaper stated, without attributing it as an allegation, that Carter's bonus was linked to the chamber's financial performance. The Newspaper then published an editorial on March 2 headlined "Chamber CEO's actions raise serious questions" and with a subheadline, "Funds were shifted that made a loss look like a profit,

17

entitling CEO to a bonus." The editorial states that reports of "highly questionable stewardship of the financial affairs of the chamber by Carter" had been laid out in a series of news stories. The piece goes on to say that the news accounts describe "duplicitous dealings by Carter in his relations with the membership and the executive committee." *Id.* The editorial also states that in "an attempt to intimidate critics of his conduct," Carter removed two board members from their positions after they attempted to bring transparency and accountability to the chamber. The editorial briefly mentions that the "shifting of funds" allegation was made in Bentley's letter, but none of the other aforementioned statements were attributed to anyone as allegations. *See id.*

We disagree with the Newspaper's claim that it was simply reporting allegations by third parties. The gist of the editorial was that the statements in the prior articles regarding Carter's shifting of funds for his own financial gain and intimidation of his critics were true, not that they were merely the accusations of others.

### 2. Fact Issue on Substantial Truth

The Newspaper next contends that the court of appeals erred in finding a fact issue on whether the statements at issue were substantially true. Specifically, the Newspaper asserts that the court of appeals incorrectly found a fact issue (1) regarding Carter's entitlement to a bonus based on evidence that Carter's contract did not make his bonus dependent on the chamber's financial performance and (2) regarding the existence of accounting "deficiencies" in financial statements prepared by Carter based on an auditor's report prepared after the articles were published.

To establish the truth defense at the summary judgment phase, a defendant must show that the gist of the publication is substantially true. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

18

This requires consideration of whether, in the mind of an average reader, the alleged defamatory publication is more damaging to the plaintiff's reputation than a true statement would be. *Neely*, 418 S.W.3d at 63–64; *McIlvain*, 794 S.W.2d at 16 (citing 53 C.J.S. *Libel & Slander* § 109(a) (1987)). The gist here is that Carter shifted chamber funds for his own financial gain. The Newspaper concedes it reported that Carter's bonus was dependent on the chamber's financial performance but argues this was true according to Bentley's statements at executive committee meetings, Bentley's letter to the chamber board, and deposition testimony of the chamber's chairman. Carter responded to this claim by producing his 2007 employment contract amendments and claiming in his affidavit that under that contract, he was to receive a $10,000 "performance" bonus no matter the financial performance of the chamber. According to the Newspaper, it never reported that Carter's contract allowed for a bonus and therefore the contract is irrelevant to whether its reporting was substantially true. Moreover, the Newspaper asserts that Carter himself testified that his bonus "had some connection" to the financial performance of the chamber which in turn implicated his performance and the attainment of some financial goals.

But Carter's 2007 contract provided that his term of employment was to continue until December 31, 2008. It set out Carter's annual salary and provided that Carter was to be paid a performance bonus as soon as feasible after ratification of the contract which occurred on February 15, 2007. Nothing in the contract provided that the bonus was related to the financial performance of the chamber or provided for a subsequent bonus. In December of 2007, the executive committee began reviewing Carter's contract for an extension and a potential raise and bonus. Carter testified

19

in a deposition that his performance bonus was not singularly linked to the financial performance of the chamber, but that it was a component.

The Newspaper reported that Carter shifted chamber funds to be entitled to a bonus. The evidence raised a fact question regarding whether this was more harmful to Carter's reputation than if the Newspaper had reported that Carter's prior contract entitled him to receive a flat bonus regardless of the financial state of the chamber and that Carter was under consideration for a subsequent bonus of which the chamber's financial performance would be a component. *See Neely*, 418 S.W.3d at 63–64; *McIlvain*, 794 S.W.2d at 16.

The Newspaper also contends that the court of appeals erred in finding the independent auditor's report—issued months after the articles were published—created a fact issue as to the truth of whether the financial reports Carter prepared contained financial irregularities or inaccuracies. The Newspaper submits that the audit does not exonerate Carter in the matter and further asserts that its reports were substantially true because Carter admitted to the errors. The Newspaper cites *City of Keller v. Wilson* for the proposition that we may not ignore relevant undisputed facts and must look to them in deciding whether the evidence creates a disputed fact issue. *See* 168 S.W.3d 802, 824–25 (Tex. 2005).

The court of appeals found the auditor's report did not establish the truth or falsity of Bentley's accusations. 567 S.W.3d at 19. We agree. The auditor's report was ambiguous at best. It does not exonerate Carter; neither does it confirm the gist of Bentley's accusations. The report says, "The staff-prepared financial statements had material misstatements. The misstatements are due to omissions, accounting applications and or lack of current accounting requirements." The

report also concludes "the financial statements" were corrected, and the auditor concluded that the statements "present fairly, in all material respects, the financial position of the Corpus Christi Chamber of Commerce as of December 31, 2007."

But even agreeing with the Newspaper that the audit does not by itself create a fact issue as to the substantial truth of its reporting, we still agree with the court of appeals that there is a fact issue that must be resolved by a jury. While Carter admits he did not initially confirm the proper accounting of his salary deferral and that he oversaw a transfer of funds from the building fund to the chamber's operating expenses, he claimed his actions were consistent with the modified accrual accounting method and that he properly transferred funds. That Carter did so illegally or to be entitled to a bonus is not established as a matter of undisputed fact in this record. Put another way, Carter may have played a part in accounting errors that were later corrected, but that does not establish a fraudulent or criminal intent, which was the gist of the Newspaper's reporting. *See* 567 S.W.3d at 18 (citing TEX. PENAL CODE §§ 31.03, 32.32). Thus, we agree with the court of appeals that the Newspaper was not entitled to summary judgment because it failed to conclusively prove the substantial truth of the Newspaper's alleged defamatory statements.

### C. Protected Opinion

Finally, the Newspaper argues that the editorial published on March 2 contained non-actionable opinion, not statements of fact, and the court of appeals erred in holding otherwise. "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Neely*, 418 S.W.3d at 62 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22 (1990)). Therefore, in distinguishing between fact (verifiable as false) and opinion, we focus on a statement's

21

verifiability. *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). But we note that even if a statement is verifiable as false, we consider the entire context of the statement which may disclose that "it is merely an opinion masquerading as fact." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018). The question of whether a statement is non-actionable opinion is a question of law. *Id.* at 625 ("Meaning is a question of law."); *Bentley*, 94 S.W.3d at 579 (discussing meaning in the context of determining whether a publication is a constitutionally protected expression of opinion).

The Newspaper claims the statements in the editorial are subjective and not capable of objective proof as true or false. The Newspaper compares statements in the editorial such as Carter's "highly questionable stewardship of the financial affairs of the chamber" to statements that a court found to be constitutionally protected opinion—such as that a former Senior Ranger captain of the Texas Rangers "was a 'blight on law enforcement.'" *See Associated Press v. Cook*, 17 S.W.3d 447, 454 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (concluding that the statements about the Texas Ranger were "little more than name calling"). Although some statements in the editorial are assertions of opinion, the editorial here said much more. First, the subheadline states "Funds were shifted that made a loss look like a profit, entitling CEO to a bonus." The editorial goes on to state that the prior news reports "describe duplicitous dealings by Carter in his relations with the membership and the executive committee." The editorial continues that "[t]wo executive committee members . . . were removed from the committee by Carter after they attempted to bring transparency and accountability to the finances," and that their removal was "nothing less than an

22

attempt to intimidate critics of [Carter's] conduct." These statements are verifiable as false and are not protected opinion.

Further, the context of the editorial indicates that it is not simply opinion masquerading as fact. Although the editorial states that "[t]he business side of the newspaper and the opinions expressed in this editorial page space are separate," the editorial also stated that a series of news stories had laid out reports of "highly questionable stewardship of the financial affairs of the chamber by Carter," indicating that the statements in the editorial were supported by the prior reporting. We agree with the court of appeals that the editorial is not protected opinion.

\* \* \*

While the United States and Texas Constitutions guarantee the people a right to a free press, people who misuse that liberty may be held accountable. The Newspaper claims it proved as a matter of law that the articles at issue were substantially true, but we agree with the court of appeals that the evidence raised a fact question on that issue. Further, the Newspaper did not prove it was entitled to summary judgment on the ground that the editorial was protected opinion. Accordingly, we affirm the judgment of the court of appeals and remand the case to the trial court.

_____

John P. Devine
Justice

**OPINION DELIVERED:** May 24, 2019

23