

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00327-CV

**NETFLIX, INC.**; Netflix Worldwide Entertainment, LLC; Kyoko Miyake; Sarit G. Work; Samantha Knowles; Kate Gill; Jigsaw Productions, LLC; Muddy Waters Productions LLC; Alex Gibney; Philip Ross; Jo Ann Rivera; Laura A. Martinez; Brittany A. Martinez; Michelle C. Martinez; and Jose H. Martinez,
Appellants

v.

Tonya **BARINA**,
Appellee

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CI04501
Honorable Cathleen M. Stryker, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: August 31, 2022

AFFIRMED

This appeal involves a defamation suit and the Texas Citizens Participation Act (TCPA). Media Appellants Netflix, Inc.; Netflix Worldwide Entertainment, LLC; Kyoko Miyake; Sarit G. Work; Samantha Knowles; Kate Gill; Jigsaw Productions, LLC; Muddy Waters Productions LLC; and Alex Gibney are responsible for the documentary-style program "Guardians, Inc." from the Netflix series *Dirty Money*. The episode, which aired March 11, 2020, scrutinized the guardianship of San Antonio business owner Charles Thrash. Appellee Tonya Barina, guardian

of the estate of Charles Thrash, sued the Media Appellants for defamation. The Media Appellants moved to dismiss the defamation suit under the TCPA, but the trial court denied the motion. The Media Appellants now bring this interlocutory appeal.

**BACKGROUND**

Charles Thrash is a millionaire and owner of a successful automotive repair shop. In 2017, guardianship proceedings for Thrash began after an anonymous person reported that Thrash's girlfriend, Laura Martinez, was mishandling Thrash's assets. Thrash was seventy-nine years old at the time and suffered from Alzheimer's disease. The following year, Thrash's great-niece, Tonya Barina, became guardian of his estate, and Laura, along with her adult daughter, Brittany Martinez, spent the next couple years contesting the guardianship with the help of attorney Philip Ross. Many of the facts underlying this case are set forth in four previous opinions in appeals numbered 04-19-00104-CV (capacity, guardianship), 04-19-00236-CV (annulment), 04-19-00477-CV (pleadings struck, failure to intervene), and 04-19-00555-CV (sanctions).

In 2019, the Media Appellants were working on "Guardians, Inc." In June 2019, they possessed a copy of a court order sanctioning Laura, Brittany, and Ross in Thrash's guardianship case. The order stated that at no time was Laura Charles Thrash's common law wife nor should she claim to be. Yet, "Guardians, Inc." labels Laura as Thrash's common law wife. The trial court also found that Ross and Laura 1) "engaged in a scheme to cause Thrash, a totally incapacitated individual without the capacity to contract or marry, to participate in a marriage ceremony" in violation of the court's order; 2) needlessly wasted resources in this endeavor since the marriage then had to be annulled; 3) tried to have Thrash adopt Laura's adult children, Brittany and Joe, in bad faith and in violation of court orders; and 4) wasted resources in attempting to avoid sanctions following their failed marriage scheme. "Guardians, Inc." does not report on these findings. The trial court sanctioned and discredited Ross, Laura, and Brittany, the same individuals who are the

featured narrators of Thrash's guardianship in "Guardians, Inc.," for bad faith abuses. We affirmed the trial court's sanctions order. We also dismissed the appeal of Billy Duncan, a friend of Thrash featured in "Guardians, Inc.," for want of jurisdiction. "Guardians, Inc." covers none of this background in its feature of Thrash's guardianship. Instead, the episode features Ross stating that Thrash's guardianship is a textbook case of guardianship abuse and that no evidence showed Laura acting against Thrash's best interest.

After Barina sued the Media Appellants for defamation, the Media Appellants argued to the trial court that Barina's suit should be dismissed under the TCPA because she could not establish a prima facie case for defamation by clear and specific evidence. The Media Appellants argued that their portrayal was substantially true and protected as to allegations made by third parties. Barina argued that the entire gist of "Guardians, Inc." was defamatory. The trial court denied the Media Appellants' motion, and this appeal follows.

## JURISDICTION

This court has statutory jurisdiction over this interlocutory appeal from the trial court's denial of the Media Appellants' TCPA[1] motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(12). The TCPA requires that we treat this appeal as accelerated. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.008(d).

## STANDARD OF REVIEW

We review the trial court's denial of the Media Appellants' TCPA motion to dismiss de novo. *See Nunu v. Risk*, 612 S.W.3d 645, 660 (Tex. App.—Houston [14th Dist.] 2020, pet. denied)

---

[1] Texas Civil Practices and Remedies Code "Chapter 27, known as the Texas Citizens Participation Act (TCPA), is an 'anti-SLAPP' statute that permits defendants targeted by 'Strategic Lawsuits Against Public Participation' or SLAPP suits to move for dismissal if the action relates to the defendant's exercise of the right of free speech, right to petition, or right of association." *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *1 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.003). The parties agree that the TCPA applies in this case.

(citing *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019)); *Cox Media Grp., LLC v. Joselevitz*, 524 S.W.3d 850, 859 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

LAW

### A. Defamation by Gist

The first step in evaluating a defamation claim is to determine whether the media at issue is reasonably capable of a defamatory meaning. *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987); *accord Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018). To determine "whether a publication is capable of a defamatory meaning, we examine its 'gist.'" *Rosenthal*, 529 S.W.3d at 434 (citing *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013), *superseded by statute on other grounds as stated in Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 791 (Tex. 2019)). That is, the reviewing court "construes the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Id.* (citing *Turner*, 38 S.W.3d 103 at 114). If the publication conveys a substantially true meaning, then it will not be considered defamatory. *Turner*, 38 S.W.3d at 115; *Neely*, 418 S.W.3d at 64. But if a broadcast "convey[s] a false and defamatory meaning by omitting or juxtaposing facts [or failing to place the details in the proper context[2]], even though all the story's individual statements considered in isolation were literally true or non-defamatory," the gist may be considered defamatory. *Neely*, 418 S.W.3d at 64 (citing *Turner*, 38 S.W.3d at 115). The next step is to determine if it is reasonably capable of defaming the plaintiff. *Tatum*, 554 S.W.3d at 625 (citing *Rosenthal*, 529 S.W.3d at 437–41).

---

[2] *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

## B. Elements of a Plaintiff's Prima Facie Defamation Claim

Where, as here, the parties do not dispute that the TCPA applies to the defamation claim at issue, the plaintiff (here, Appellee) has the burden to establish a prima facie case[3] of each element by clear and specific evidence[4] to avoid dismissal of the claim. *Rosenthal*, 529 S.W.3d at 434 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c)).

The elements of a prima facie defamation claim include:

> (1) the defendant published a false[5] statement; (2) that defamed[6] the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se).

*Id*. (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)).

If the plaintiff satisfies this burden, the defendant may still obtain dismissal by establishing "an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law [(meaning that there is no genuine issue of fact)][7]." *Szymonek v. Guzman*, 641 S.W.3d 553, 564 (Tex. App.—Austin 2022, pet. denied) (quoting TEX. CIV. PRAC. & REM. CODE ANN § 27.005(d)). The elements relevant to this appeal are discussed below.

---

[3] "A prima facie case is 'the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376–77 (Tex. 2019) (quoting *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 721 (Tex. 2016)).

[4] "Clear and specific evidence means that the plaintiff 'must provide enough detail to show the factual basis for its claim.'" *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) (citing *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015)).

[5] If, as here, "the alleged defamatory statements were made by a media defendant over a matter of public concern," then "the plaintiff bears the burden of proving falsity." *Rosenthal*, 529 S.W.3d at 434 (citing *Toledo*, 492 S.W.3d at 713–14).

[6] "A defamatory statement is one that 'tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc*., 603 S.W.3d 409, 417 (Tex. 2020) (quoting Restatement (Second) of Torts § 559 (Am. L. Inst. 1977)).

[7] *See, e.g., Finley v. Hettig & Co*., No. 05-93-00958-CV, 1994 WL 110732, at *1 (Tex. App.—Dallas Mar. 30, 1994, writ denied) (quoting *Gibbs v. General Motors Corp*., 450 S.W.2d 827, 828 (Tex. 1970)).

### C. Substantially True v. False

#### 1. *Falsity as an element of defamation if the plaintiff is a public figure*

If the plaintiff is a public figure and the defendant is a media outlet, then the plaintiff has the burden of proving falsity. *Bentley v. Bunton*, 94 S.W.3d 561, 586–87 (Tex. 2002); *Turner*, 38 S.W.3d at 116.[8] This burden must be satisfied at the motion-to-dismiss stage of the proceedings. *Hall*, 579 S.W.3d at 380.

#### 2. *Substantial truth as a defense*

In general, a showing of the substantial truth of a broadcast's gist is a defense that can defeat a plaintiff's defamation claim. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990) (citing *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)); *see also Turner*, 38 S.W.3d at 115 ("[T]he substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist'…."). To not be false, "[a] statement need not be perfectly true[ ] as long as it is substantially true." *Hall*, 579 S.W.3d at 377 (citing *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016)). But "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable." *Neely*, 418 S.W.3d at 63 (citing *Turner*, 38 S.W.3d at 115 ("[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.")); *accord McIlvain*, 794 S.W.2d at 16.

---

[8] The parties agree that Barina is a public figure and that Thrash's guardianship is a matter of public concern.

**D. Privilege Defenses**

*1. Fair Comment Privilege*

The Texas Supreme Court has defined the fair comment privilege as "an affirmative defense to a defamation action extending to publications that are 'reasonable and fair comment[s] on or criticism[s] of ... matter[s] of public concern published for general information.'" *Rosenthal*, 529 S.W.3d at 441 (quoting TEX. CIV. PRAC. & REM. CODE § 73.002(a), (b)(2)). "We have said that 'if a comment is based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege.'" *Id*. (quoting *Neely*, 418 S.W.3d at 70).

*2. Third-Party Allegation Rule*

Media outlets that accurately report allegations made by a third party about matters of public concern can assert the truth as a defense. *Hall*, 579 S.W.3d at 380 (citing TEX. CIV. PRAC. & REM. CODE § 73.005(b)). However, media outlets must be careful not to accuse, malign, or "take the extra step" of implying an accusation that forfeits the substantial truth defense. *Hall*, 579 S.W.3d at 380 (citing *Rosenthal*, 529 S.W.3d at 431).

*3. Official Proceedings Reporting*

Regarding coverage of an official proceeding, the Texas Supreme Court has held: "A private individual who sues a media defendant for defamation over a report on official proceedings of public concern has the burden of proving that the gist of the report was not substantially true— that is, that the report was not a fair, true, and impartial account of the proceedings. That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings." *Toledo*, 492 S.W.3d at 715.

**ANALYSIS**

**A. Defamation by Gist**

In considering how a person of ordinary intelligence would perceive "Guardians, Inc.," we start with the series title, *Dirty Money*. *See Rosenthal*, 529 S.W.3d at 431 (noting that "welfare queen" in the title contributed to defamatory gist). According to the Merriam-Webster dictionary, "dirty money" means "money earned in an illegal activity."[9] To emphasize the point, the title theme song is a track from hip hop duo Run the Jewels called, "Lie, Cheat, Steal."

During the episode, Ross, Laura, and Brittany present Thrash's plight, impugning his guardians. Ross sits behind his desk and states confidently that Thrash has been exploited through his guardianship. His statement is featured and never challenged throughout the course of the documentary. *See Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018) (requiring evidence within the publication that it intends to convey the defamatory gist or implication).

As argued by Appellee, falsely accusing someone of committing a crime (e.g., exploitation) is defamatory per se. *See Rosenthal*, 529 S.W.3d at 439. As argued by the Media Appellants, it may not be fair to assume that everyone subjected to scrutiny on the show is being accused of a crime. *See id*. (requiring reasonable construction of the publication at issue in a defamation claim). Nevertheless, the episode title at issue, "Guardians, Inc.," points to the business of guardianships, casting a dystopian pall over the concept. At the outset of the episode, "Guardians, Inc." clearly states its thesis: "Guardianship exploitation is the crime of the twenty-first century." The episode sets the stage early on for presenting guardians as criminal exploiters. *See id.*

By the time the episode introduces Tonya Barina, it has laid out the stages of guardianship abuse, beginning with referral, then a finding of incapacitation, isolation, and medication, leading

---

[9] *Dirty money*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/dirty%20money (last visited June 21, 2022).

to control of a ward's assets and the stripping of a victim-ward's civil rights. The stage has been set for its case-in-point. Ward has been pitted against guardian: Barina is the guardian, and Thrash is the ward. *See Tatum*, 554 S.W.3d at 624 (quoting *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004)) (assigning the appellate task of determining whether the plaintiff's alleged implication is among the objectively reasonable interpretations). But Thrash does not speak for himself. Instead, Ross, Laura, and Brittany speak for him. However, according to a true report of proceedings, they are not appropriate representatives. *See Guardianship of Thrash*, No. 04-19-00555-CV, 2021 WL 1199056, at *11 (Tex. App.—San Antonio Mar. 31, 2021) (mem. op.) (describing and affirming the trial court's May 29, 2019 sanctions order against Ross, Laura, and Brittany). The evidence shows that the Media Appellants possessed the trial court's May 29, 2019 sanctions order against Ross, Laura, and Brittany a week after the trial court issued it and well before the show aired on March 11, 2020.

"Guardians, Inc." uses juxtaposition to build its thesis that guardianship abuse is a crime and an epidemic that must be exposed through making examples of abusers. The episode's score is ominous and tense. The episode intersperses dramatic animations to illustrate or visually interpret the guardianship narratives. When Barina speaks, the camera zooms in on her hands and feet to show fidgeting but does not give the same visual treatment to Ross, Laura, Brittany, or Ross's assistant, Jo Ann Rivera. When the camera cuts away from Barina, the viewer is shown highlighted documents or statistics or general commentary from guardianship critics to suggest inconsistency, but the segment does not similarly treat Ross, Laura, Brittany, or Rivera. The last shots of Barina, Laura, and Thrash's friend, Billy Duncan, leave the viewer with the conclusion that guardians sell assets while friends and family try to stop them. An ordinary viewer could reasonably conclude from this episode that Barina is meant to be portrayed as an exploitative guardian. *See Tatum*, 554 S.W.3d at 628 (citing *Turner*, 38 S.W.3d at 115) ("[A] plaintiff can rely

on an entire publication to prove that a defendant has implicitly communicated a defamatory statement."). In fact, the hate mail and angry internet posts made clear that viewers were furious and livid that Barina could legally maintain the abusive guardianship that every other interviewed person on the program described.

Keeping in mind the undesirable chilling effect of holding media participants liable for defamation, *see Tatum*, 554 S.W.3d at 632, we nonetheless conclude that the documentary was capable of defamatory meaning. *See Rosenthal*, 529 S.W.3d at 434.

### B. False and Defamatory of Barina

Accepting that "Guardians, Inc." could be reasonably viewed as defamatory, it was Barina's burden to show that the defamatory gist *regarding her was false*, which is where the parties focus the argument in this case. *See Turner*, 38 S.W.3d at 116.

"Guardians, Inc." features Ross accusing Barina of bleeding money from Thrash's estate without explaining that the court allowed her to use estate money for legal expenses and that she had to pay attorney fees to defend against improper legal attacks from Ross, Laura, and Brittany regarding Thrash's guardianship. *See Turner*, 38 S.W.3d at 115; *Guardianship of Thrash*, 2021 WL 1199056, at *4. During Barina's defamation suit in the trial court, Barina submitted court documentation from the *Guardianship of Thrash* that showed the trial court ordered funds from Thrash's estate to pay for Barina's attorney's fees and that it also ordered Ross, Laura, and Brittany to reimburse Barina's attorney fees that were related to sanctions they incurred from lying to the court about Laura's and Thrash's "marriage" in violation of a court order. *See Guardianship of Thrash*, 2021 WL 1199056, at *6.

Furthermore, "Guardians, Inc." does not disclose that Thrash has a medical diagnosis of Alzheimer's type dementia. (In fact, in one court proceeding, the trial judge had to assure Thrash that he found him not guilty, even though the proceeding was about Thrash's guardianship, not a

criminal proceeding against Thrash.) Instead, the show cites a letter from Thrash's physician, apparently written at the request of Thrash and Laura, which states that Thrash is mentally capable with Laura's help. In support, Ross asserts that Thrash does not lack capacity to care for himself or manage his affairs. But this featured commentary takes place after "Ross and Laura 'engaged in a scheme to cause Thrash ... without the capacity to contract or marry, to participate in a marriage ceremony' by taking him out of Bexar County, obtaining a marriage license in DeWitt County, arranging and participating in a marriage ceremony on March 4, 2019,'" which Laura immediately followed with a request to the court for spousal support. *See Guardianship of Thrash*, 2021 WL 1199056, at \*3; *Turner*, 38 S.W.3d at 119. The day after the fraudulent wedding, Ross signed papers on Thrash's behalf that caused Laura's adult children to be adopted by Thrash. *See id*.

As Appellee points out, the trial court had found Ross, Laura, and Brittany not to be credible, *see id*., and the Media Appellants had been made aware of this finding. "Guardians, Inc." still featured them in its documentary as narrators for Thrash's guardianship experience. *See Tatum*, 554 S.W.3d at 635. Overall, it was misleading for "Guardians, Inc." to use Thrash as an example of abuse by incapacitation, to suggest that Barina was unfairly controlling the assets of a capable person, and to hold out Ross and Laura as authorities on the matter. *See Turner*, 38 S.W.3d at 119 (holding that a plaintiff can bring a defamation claim based on a false and defamatory impression created by omitting material facts or misleading juxtaposition).

## C. Privilege Defenses

The privilege defenses cited by the Media Appellants fall under Texas Civil Practice and Remedies Code section 27.005(d), which requires them to establish the defenses as a matter of law. TEX. CIV. PRAC. & REM. CODE ANN § 27.005(d); *Szymonek*, 641 S.W.3d at 564.

*1. Fair Comment*

The Media Appellants claim that statements from "Guardians, Inc." are protected as fair comment or criticism. *See Rosenthal*, 529 S.W.3d at 441. However, this defense ignores the crux of Appellee's defamation claim, which depends on the gist of the entire episode. *See id.* at 434. Breaking down individual statements as fair comments within an episode that points an accusatory finger at its featured guardians fails to account for the episode's thesis. *See id.* Like in *Rosenthal*, there is no actual evidence of Barina committing wrongdoing. Therefore, if the gist of the show unfairly defames her, the Media Appellants cannot avail themselves of the fair comment privilege to obtain dismissal of Appellee's defamation suit. *See id.* at 441.

*2. Official Proceedings Reporting*

The Media Appellants similarly claim that any comment related to probate court proceedings are protected under the Official Proceeding privilege. *See KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016). The problem is the same: the gist of "Guardians, Inc." accuses Barina of guardianship abuse. *See id.* An accurate portrayal of Thrash's case in the probate court would not lead a reasonable viewer to conclude that she should be accused of exploitation. *See id.* (requiring a defensible report to be a fair, true, and impartial account of the proceedings).

*3. Third-Party Allegations*

The Media Appellants claim that they cannot be held liable for reporting Ross's accusations. *See Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019). However, the third-party allegation rule requires that the media outlet not take the additional step of adopting or endorsing the allegations. *See id.* Here, "Guardians, Inc." places Ross, Laura, and Brittany in charge of Thrash's story. It edits their accounts together with statements that suggest their accusations of exploitation have been confirmed. "Guardians, Inc." takes that one step further,

and this adoption of the allegations disqualifies the Media Appellants from relying on the third party allegation rule as a defense. *See id*.

"Guardians, Inc." maligns Barina as a guardian and caused many viewers to send her angry hate mail upon viewing the episode. Viewers were led to believe that Barina took advantage of an elderly but capable millionaire, wrongly sold his assets, and used his estate for personal gain. The official proceedings for Thrash's guardianship do not support these conclusions. *See, e.g.*, *Guardianship of Thrash*, 2021 WL 1199056. Where the documentary medium is the message, which viewers depend on for credible reporting, media outlets such as Netflix, Inc. enjoy freedom of speech and press, but they are ultimately responsible for delivering truth. *See Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013), *superseded by statute on other grounds as stated in Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 791 (Tex. 2019) (quoting TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege.")). Where they fail in that responsibility, they remain liable for defamation. *See id*.

## CONCLUSION

Because "Guardians, Inc." is capable of being construed as a defamatory program against Barina and because the Media Appellants have not established that they are entitled to dismissal though any affirmative defense, we conclude that the trial court did not err in denying their TCPA motion to dismiss. Accordingly, we affirm.

Patricia O. Alvarez, Justice