

# NUMBER 13-19-00443-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

TEXAS DEPARTMENT OF PUBLIC SAFETY
AND STEVEN MCCRAW IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE TEXAS
DEPARTMENT OF PUBLIC SAFETY,                          Appellants,

v.

MARIA LUISA MEJIA SUNUC, INDIVIDUALLY
AND ON BEHALF OF THE ESTATE OF MARCOS
ANTONIO CASTRO ESTRADA, AND AS NEXT
FRIEND TO L.M. AND H.M., MINORS, ET AL.,             Appellees.

---

On appeal from the 389th District Court
of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

Before Justices Benavides, Hinojosa, and Tijerina
Memorandum Opinion by Justice Benavides

Appellees, Maria Luisa Mejia Sunuc, individually, on behalf of the estate of Marcos Estrada, and as next friend to L.M. and H.M., minors, and Maria Maura Espital Yucute, as next friend to C.C.E., E.C.E., and E.W.C.E., minors, filed suit alleging various claims against appellants, the Texas Department of Public Safety (DPS) and Steven McCraw in his official capacity as Director of DPS, related to the shooting deaths of Marcos Estrada and Leonardo Coj Cumar during a police pursuit. Appellants seek interlocutory review of the denial of their motion for summary judgment asserting sovereign immunity from these claims. Because we determine that (1) the motion for summary judgment constitutes a motion to reconsider appellants' previously filed plea to the jurisdiction, and (2) appellants failed to timely invoke our interlocutory jurisdiction to review the trial court's denial of that plea, we dismiss this appeal for want of jurisdiction.

## I.    BACKGROUND

On October 25, 2012, a DPS helicopter joined an ongoing police pursuit of a vehicle traveling on a rural road near the Texas, Mexico border. It is undisputed that the troopers in the helicopter, Tactical Flight Officer Miguel Avila, pilot Lieutenant Johnny Prince, and co-pilot Captain Holland, believed that the tarp covering the bed of the truck was concealing drugs—not people. Acting under DPS's then-policy permitting an airborne use of deadly force on a fleeing vehicle, Trooper Avila attempted to disable the truck by firing at the vehicle's tires with a high-powered rifle. Nineteen rounds later, the truck was disabled; however, it was then discovered that the vehicle was transporting undocumented immigrants, not drugs, and that several of Trooper Avila's errant shots had unintentionally hit and killed Marcos Estrada and Leonardo Coj Cumar as they lay

2

underneath the tarp in the bed of the truck.

Appellees filed suit for wrongful death, alleging various theories of negligence against DPS based on improper use of the helicopter and rifle. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2). They also sought a declaratory judgment that DPS's use-of-force policy violated Estrada and Cumar's rights under the Texas and United States Constitutions or alternatively, that Director McCraw's implementation or retention of the policy was *ultra vires*.

Approximately seven months later, appellants filed a plea to the jurisdiction contending that all of appellees' claims were barred by sovereign immunity. DPS argued that appellees' allegations, although labeled otherwise, amounted to an intentional tort claim, which is excepted from the Texas Tort Claims Act's (TTCA) waiver of immunity. *See id.* § 101.057(2). Alternatively, DPS argued that it could conclusively establish that its troopers were entitled to official immunity, thereby cloaking DPS in derivative immunity. *See DeWitt v. Harris County*, 904 S.W.2d 650, 653–54 (Tex. 1995) (establishing that a governmental unit's immunity is not waived under § 101.021(2) when its liability is based on an employee's negligence and the employee is entitled to official immunity).

In support of its assertion of official immunity on behalf of its troopers, DPS attached a video of the incident taken from the helicopter that also includes audio of the conversations between the troopers throughout the incident. Additionally, DPS attached detailed sworn statements from each of its troopers explaining their beliefs about the contents of the vehicle and the factors they considered in deciding to fire on the vehicle.[1]

---

[1] These statements were made as part of the Texas Rangers' investigation of the incident.

For example, Lieutenant Prince's statement provided, in part:

> On 10-25-2012, I was operating an American Eurocopter Astar 350 B3 with U.S. number N329TX, registered to [DPS]. This helicopter is black and white in color with Texas DPS on the tail section and underneath the fuselage. The helicopter has a Texas emblem on the left and right side of the helicopter. On 10-25-2012, I was wearing a BDU flight suit, green in color with a shoulder holster containing a DPS issued Sig Sauer P239. My flight suit has a DPS Aircraft Lieutenant Badge. On the right chest . . . area is a [v]elcro patch with my last name Prince. I also wear a DPS Aircraft Lieutenant badge on the right side of my belt. In flight, I wear a helmet issued by [DPS]. The helmet plugs into the helicopter radio and intercom system that allows a voice activated system in the helicopter for all crewmembers to communicate.
>
> . . . .
>
> At approximately 2:10 PM, we departed the Edinburg Airport to assist DPS Criminal Investigations Division Agents in an attempt to serve a felony warrant. I was pilot, Captain Holland was the co-pilot[,] and Tactical Flight Officer Trooper Avila was the marksman. The suspect was not located.
>
> We proceeded to the northwestern part of Hidalgo County and the eastern part of Starr County in support of Contingency Plan Tier 1, which was in effect due to recent cross[-]border violence. The contingency plan [went] in[to] effect on Monday and was scheduled to last through Friday. Northwestern Hidalgo County and eastern Starr County [are] where multiple pursuits of stolen vehicles and drugs have been seized in recent months, including the seizure that we assisted with eight hours earlier, on the corner of FM 2058 and Mile 14. I have personally been involved in multiple searches of vehicles and suspects in that area. This area had multiple north/south roads that have access to the Rio Grande River and are used for smuggling operations. Some of the primary roads are Pipeline Road and El Pinto Road; both are smuggling corridors from the Sullivan City area.
>
> Captain Holland was seated in the left front seat as co-pilot. His duties were to operate the camera, aero computer, police radios, and assist the pilot with his duties. The aero computer is a mapping system normally operated on a 10-inch monitor and a 12-inch monitor that is used for the camera. This equipment is located in front of the co-pilot and is operated by a hand[-]held joystick. The on and off buttons for the co-pilot to operate any radio system to transmit or receive are located in the middle of the dash area. There is a two-minute delay once the button is activated for the recorder to begin recording on an SD card.

4

I was seated in the right front seat of the helicopter as pilot of this flight. My duties were to operate the helicopter in a safe manner, [and] if emergencies occur[ed], I would handle all issues regarding mechanical failures. I . . . also control[led] the navigation, communications with air traffic controllers, and handle[d] all clearances into controlled airspaces. I . . . assist[ed] with police radio communications if necessary. On the right side by the door[,] above . . . my right knee[,] is a six-inch monitor that allows me to see the camera and aero computer; this is also controlled with a switch depending on what screen I want to see. I have other instruments that [I am] required to monitor for a safe flight of the helicopter. As the pilot, I am the pilot in charge of the operation of the aircraft. . . . [A]ll operations and flights[,] including this one[,] are operated under the term crew resources management, which means everyone has responsibilities and we assist each other as crewmembers.

Tactical Flight Officer Trooper Avila was seated in the right rear cabin of the helicopter. His duties are observer, marksman, assists with police radios, and can deploy to the ground if necessary. As a marksman, he is issued a Larue .308, and has received training in Aerial Use of Force. Aerial Use of Force training consists of discharging firearms from certain heights[,] normally from 100 to 150 feet[,] [and] [l]earning commands from the pilot . . . authorizing [the] discharg[e of firearms] from the helicopter. Training for the marksman is usually conducted every quarter in firing from the helicopter.

I flew DPS 108 to the intersection of Pipeline Road and Farm to Market 490 and turned south on Pipeline Road. There was good visibility[,] and the wind was out of the south. As we traveled south on Pipeline, I could see a fast[-]moving dust trail east of Pipeline Road around the area of Mile 14 moving east. Simultaneously, maybe seconds later, I heard over the DPS Base radio frequency of a pursuit traveling east from Pipeline Road. I heard the unit was in pursuit of a red Ford pickup. I proceeded to fly towards the fast[-]moving dust cloud[.] I did not see Captain Holland activate the recording equipment but that is standard procedure for us. I was receiving updates from the pursuing unit[,] who I identified by his unit number to be a Texas Parks and Wildlife Game Warden. I don't remember the exact unit number, but it was a number consistent with the Game Warden[']s radio call numbers. I arrived overhead within minutes . . . and could see the pursuit proceeding southbound on El Pinto Road. When I arrived overhead, I could visually see a Texas Game Warden in pursuit of a red Ford F[-]150 pickup. The game warden's vehicle was a dark colored pickup with its emergency lights on; I know he did not have overhead lights on top of the unit. I estimate he was a quarter of a mile behind the red Ford pickup. I positioned the

5

helicopter to the left side and slightly behind the red Ford pickup, which is the practice of a DPS helicopter in pursuits because it allows view for the pilot and the marksman, while the co-pilot observes everything on the monitor. The co-pilot can look around, but normally they remain watching the monitor and run the camera. The pickup was traveling at a high rate of speed; I was approximately 400 to 500 feet above the ground. I remember Captain Holland say that there were bundles in the pickup, or something like that. As a pilot, I am required to monitor instruments within the cockpit that maintain the limitations of the helicopter, including air speed, torque, and the rotor speed. I was also visually looking for obstacles that include towers and other aircraft. Apart from that, I maintained a visual of the road ahead. The game warden advised that they were traveling over 80 mile[s] an hour. I could tell and confirmed that the vehicle was traveling at a high rate of speed because of the speed that I was traveling at, and I could visually see that it was traveling at a high rate of speed, especially for the road conditions. El Pinto Road is a caliche road, dusty, and rough. It is not a very wide road, but it has enough room for vehicles to meet each other. The traffic on El Pinto Road during the pursuit was light; however, the pursuit met three vehicles that needed to take evasive action when they obviously saw the red Ford pickup. I was looking ahead to observe any vehicles or large trucks that are common in the area because of the oil and gas companies. By evasive action, the vehicles pulled over to the side of the road[.] [O]ne pulled into a drive-way [sic][.] I don't know if it was going that way, but it looked like it was taking evasive action to get out of the way to avoid a head[-]on collision. I remember transmitting what I call a "blind call," to U.S. Border Patrol on the La Joya Border Patrol repeater. I transmitted the location of the pursuit. Captain Holland continued to give updates on the DPS Base A repeater, which was also being used by the [g]ame [w]ardens pursuing the red Ford pickup. The reason I was calling Border Patrol was to prepare them that a pursuit with a drug smuggler was moving in a southerly direction and would likely return to the Rio Grande River.

The red Ford pickup was an extended cab and did not look very old. By seeing the outside mirrors, I knew it was an F-150. It confirmed what the game warden had stated on the radio that he was pursuing a red Ford F-150. I could see a tarp in the bed of the pickup that appeared to be covering something stacked higher towards the cab of the pickup. To me that indicated that more than likely it was bundles of drugs. In my experience[], I have seen illegal aliens covered in the bed of pickups; however, they usually laid flat and in a single file. Tarps or any other covering device[s] are usually used to conceal any illegal activities from aircraft flying over because the appearance would resemble the bottom of the pickup bed.

6

I remember seeing the red Ford pickup slow down a little bit, so it could maneuver around a curve. I dropped a little altitude and did a 360 completely around the truck, so that the driver would know that there was a police helicopter in the pursuit and so I could see all sides of the pickup and the cab. I could see a passenger sitting in the right front passenger seat. All I could tell is that a person was in the passenger front seat. I could not see any other occupants inside the cab. I tried to see in the backseat area[,] and I could not see anything inside. I remember that the back seat windows appeared to be tinted, or very dark, making it difficult to see. All I could see was the steering wheel[,] and it looked like the driver's arms were bare. I could not see the driver's head or body. I remember I relayed to all of the crewmembers that I had seen the driver and a passenger in the front seat of the pickup. The bed had the same appearance on the tarp on the right side of the pickup and all the way around[;] it all looked the same, and it looked like it was covering bundles of drugs. In my experience, drivers involved in pursuits that are smuggling illegal aliens will usually pullover and flee on foot, and more likely to do that when they see a police helicopter because they know that trying to outrun a police helicopter is impossible. As I continued the pursuit, I did a visual scan of the helicopter[']s instruments, monitors, the red Ford pickup, any vehicles that may be approaching from any intersection or the opposite direct of the pursuit, and the direction the helicopter was traveling. Captain Holland[,] utilizing the hand control joystick[,] zoomed in through the driver's window[.] I remember glancing at the monitor and seeing what appears to be a male's arm. Around this time, Captain Holland said that the driver was on a cell phone. When I heard that, I knew that it was possible . . . that the driver was calling a "recovery team" to be ready at the Rio Grande River. A "recovery team" simply means that large groups of people will be waiting at the river to offload the drugs. These people have been known to be cartel members and violent. The reason that the Contingency Plan Tier 1 had been activated . . . was because . . . U.S. Border Patrol Agents south of Sullivan City on the Rio Grande River had received gunfire. There had also been other violent confrontations that had recently occurred.

The pursuit continued southbound on El Pinto Road. [I knew] that if we continue[d] southbound, the pursuit would enter Sullivan City and traffic would increase dramatically with many cross streets. There is a school zone on the northside of Sullivan City. I knew that it was about 3:00 PM or a little after and there would be a lot of school traffic[,] including buses and children walking home from school. I kn[e]w that the road changes to asphalt and there are residential subdivisions on both sides of El Pinto Road with intersecting streets. Seeing the speed that the red Ford pickup was traveling on a caliche road, I expected that the speeds would increase on the asphalt road. I remember[ed] I had been on a previous pursuit, it had been raining,

the roads were wet, and the vehicle had driven against oncoming traffic on U.S. 83[. The] vehicle eventually turned onto a two[-]way asphalt farm to market road . . . and drove through a school zone in the community of La Grulla at a high rate of speed. I remember[ed] it was about 8:45 in the morning on a school day[,] and I watched the vehicle nearly strike numerous school buses and passenger vehicles. The vehicle ended up losing control and striking a house at an intersection. There had been no regard for human life during his attempt to flee from the police. I remember[ed] I hollered "no, no" because the vehicle had entered an intersection with a school bus and vehicles, [and] it was a miracle that a bad fatal accident did not occur. I retained that video to show people how smugglers fleeing from police on public roads have no regard for life.

Prior to arriving at 7 Mile Line, the game wardens asked if there were any units near El Pinto Road and U.S. 83. Captain Holland replied that we were working on it. That meant that DPS Communications was broadcasting the pursuit to other units. We started discussing ending the pursuit, which meant to engage our Ariel Use of Force because of the dangerous condition this pursuit would create if it reached the community of Sullivan City.

Aerial Use of Force is protocol used in firing a long gun by a marksman from a helicopter. To initiate the Aerial Use of Force, the pilot would give commands that are standard by DPS training in firing a long gun from a helicopter. There are four basic commands[. The first command is] "travel," which means that a marksman would have the weapon on safe, his hands off the trigger, and the barrel would be pointed down. The marksman . . . is sitting on the floor with the right rear door open. The next command is "ready." This means that the marksman would have extended the rifle to his shoulder in the ready position. The next command is "cleared hot," which means that the marksman could engage or fire. In other words, that is the only time it is safe to fire from the helicopter. It is the marksman['s] choice when to fire or not. "Cease fire" will occur when the pilot observes any obstacles such as oncoming traffic, houses, buildings, people, or if the helicopter being flown was required to make any movement that prohibited the line of fire.

During the pursuit, Trooper Avila was already in the "travel" position, the right rear door was open[,] and Trooper Avila was sitting on the floor. Trooper Avila was given the command of "ready" by me as we approached 7 Mile Line Road. The red Ford pickup made a left turn and traveled east on 7 Mile Line Road and continued at a high rate of speed for a caliche road. The red Ford pickup passed a slower moving vehicle and continued eastbound. As the pursuit continued, a truck tractor-trailer was observed

8

traveling west and would be meeting the red Ford pickup.

If the red Ford pickup continued east on 7 Mile Line, it would eventually intersect with Jara China Road[,] also known as FM 2221. This intersection is a 4-way intersection. Just east of this intersection . . . is a school, [and] at a high rate of speed, the red Ford pickup would be at the intersection within minutes. FM 2221 is a farm to market road[;] it is a two-lane road with shoulders north and south to the intersection of 7 Mile Line and proceeds east. If the red Ford pickup turned south on Jara China/FM 2221, it would travel to the community of La Joya with a high school located near FM 2221. FM 2221 would also intersect with U.S. 83. If the red Ford pickup turned north, it would be a caliche road named Jara Chine, which would lead back to a rural area and in the general direction of where the pursuit had started. At this time, we still believed that the red ford pickup had bundles of narcotics, covered with the tarp, and was more than likely headed to the Rio Grande River.

The truck tractor semi trailer [sic] that had been seen traveling westbound towards the red Ford pickup turned north onto a private drive just prior to meeting with the pickup. Captain Holland said that he did not think the red Ford pickup was going to stop. I agreed with Captain Holland[.] I do not remember what Trooper Avila said exactly, but he mentioned a school ahead. Captain Holland said that the area looked like a decent spot[,] referring to an area that Aerial Use of Force could be used. Captain Holland advised to engage the left rear tire. In my opinion, the left rear tire would allow the driver to maintain better control of the vehicle rather than shooting a front tire, which would make it much harder to control and steer. This could induce a rollover.

I lowered altitude between 150 feet and 100 feet from the ground. I pulled alongside the red Ford pickup, approximately 200 feet away. These procedures are used during [an] Aerial Use of Force. This particular Aerial Use of Force was to disable the left rear tire of the red Ford pickup so that it would not reach the intersection of FM 2221, which was near a school. The area agreed upon was a rural area with no houses, no cars in the immediate area, and we obviously did not want to shoot in an area that could contain cars, houses, and persons in the immediate vicinity. We could not wait to shoot until we were in a school zone.

I then gave the command "clear hot." During that time, the helicopter needed to be flown level, flat, and maintained as smooth as possible. I also continued to scan forward for any reason to "cease fire." Trooper Avila's assigned .308 is equipped with a suppressor that reduces the sound of shots fired from the rifle. I heard what sounded like an air rifle[,] probably

9

from Trooper Avila's mic through the intercom. I was not looking where Trooper Avila's shots were hitting, and I have no idea how many shots he fired. I continued to fly and held the helicopter approximately at a 90-degree angle. Every time I glanced at the vehicle, everything looked the same[,] including the tarp in the bed of the pickup. Shortly after that, I called for "cease fire" because I had seen a building or structure on the northside of the road a short distance ahead of us. We passed the structure and I called "clear hot'" as Captain Holland called for the left rear tire. Shortly after, Trooper Avila fired[.] I don't know how many times he fired, but I could hear the same sound as before. I looked at the pickup and observed the left rear tire going flat as it began to fishtail[.] I remember saying that the pickup was going to wreck. Captain Holland called for a "cease fire." Trooper Avila stopped engaging at that time.

I noticed that the pickup slowed down considerably because I had to slow down as well and conducted a 360-degree turn around the red Ford pickup. The pickup continued traveling east and eventually sped up considerably, not as fast as before but gained control and continued east. I heard Trooper Avila mention that both rear tires were flat. When the speed increased, Captain Holland asked for engagement on the front tire. I went back "clear hot," at which time Trooper Avila fired one time[.] I remember hearing the same air rifle sound as before. I actually was looking at the pickup and saw that the shot had hit at or near the front left tire. The pickup immediately went to the right side of the road and came to a stop. I saw that five suspects exited and ran from the passenger side of the red Ford pickup and fled south into a brushy area. I noticed most of them were wearing dark clothing except for one that was wearing a bluish colored shirt. I was extremely surprised to see five people running from the cab of the truck. I remember saying "f***** I/A's." I knew then that it was possibly an illegal alien load[,] and I became concerned of what was in back of the pickup.

The statements of Trooper Avila and Captain Holland were similarly detailed, and each statement was consistent with the video of the incident. DPS argued that the troopers were entitled to official immunity because they acted in good faith when they decided to fire on the vehicle.[2]

---

[2] "The elements of the defense of official immunity are (1) the performance of a discretionary function (2) in good faith (3) within the scope of the employee's authority." *Kassen v. Hatley*, 887 S.W.2d 4, 9 (Tex. 1994) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994)). The parties do not dispute that the troopers were performing a discretionary function within the scope of their authority.

10

To controvert the troopers' claims of good faith, appellees offered, among other evidence, the report of an expert on police pursuits and use-of-force policies who opined that the troopers had not acted in good faith. The expert was "not aware of a single law enforcement agency in the United States that has authorized or presently authorizes law enforcement officers to discharge a firearm from a helicopter in order to disable a vehicle involved in a pursuit where the only justification is ending the pursuit, as opposed to circumstances that would authorize the use of deadly force." After noting how difficult it is to accurately shoot a moving target from a helicopter, thereby placing innocent passengers and the surrounding public in danger, the expert concluded that "a reasonably prudent law enforcement officer, under the same or similar circumstances, could not have believed that the need to immediately apprehend the driver of the F-150 outweighed the clear risk of harm to the public created by attempting to disable the tires of that vehicle with the use of a firearm discharged from the helicopter."

Appellants also argued in their plea that under United States Supreme Court precedent, a claim based on violations of federal constitutional rights may only lie against a "person" and because appellees sued Director McCraw in his official capacity, as opposed to his individual capacity, appellees had failed to state a cognizable claim. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). As to appellees' request for a declaration that DPS's use-of-force policy violated the Texas Constitution, appellants argued that the Uniform Declaratory Judgments Act ("UDJA") does not waive DPS's immunity from such a claim and appellees had otherwise failed to

11

establish an underlying waiver. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (recognizing that the UDJA "waives sovereign immunity in particular cases" but otherwise it is "merely a procedural device for deciding cases already within a court's jurisdiction" (quoting *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011))).

Finally, appellants argued that the policy in question was amended following the incident so, to the extent appellees could prove that Director McCraw acted *ultra vires*, any such claim was now moot because there was no prospective relief for the trial court to grant. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 376 (Tex. 2009) (holding "that a claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief" but is generally not entitled to retrospective money damages). To support this jurisdictional challenge, appellants attached verified copies of DPS's former and current use-of-force policies. The new policy provides that "a firearms discharge from an aircraft is authorized only when an officer reasonably believes that the suspect has used or is about to use deadly force by use of a deadly weapon against the air crew, ground officers or innocent third parties." The new policy also clarifies that "a suspect's driving behavior[,] including aggressive or reckless driving to evade arrest[,] does not constitute use of a deadly weapon by the suspect."

The trial court denied the plea, and appellants did not seek interlocutory review of the trial court's decision. Over the next three years, appellees prepared for trial by deposing the three troopers, as well as the two game wardens that initiated the pursuit. Prior to trial, appellants filed a motion for summary judgment, again challenging the trial

12

court's jurisdiction. The jurisdictional arguments in the motion mirrored those appellants previously made in their plea. Appellants included the same evidence they previously attached to their original plea along with deposition excerpts from the two game wardens and the three troopers.[3] The trial court denied the motion, and appellants sought interlocutory review.

## II. APPLICABLE LAW

### A. Sovereign Immunity

Sovereign immunity protects the State of Texas and its agencies from lawsuits for money damages and deprives a trial court of subject matter jurisdiction over the plaintiff's claims. *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 75 (Tex. 2015) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)). DPS, a state agency, generally enjoys immunity unless the Legislature waives it. *See Sawyer Tr.*, 354 S.W.3d at 388 (citing *Miranda*, 133 S.W.3d at 224).

The plaintiff has the burden to allege facts affirmatively demonstrating the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). To prevail on a claim of immunity, the governmental defendant "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When a defendant challenges the existence of jurisdictional facts, the analysis "mirrors that of a traditional summary judgment." *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012)).

---

[3] Appellants also attached voluntary statements made by the two game wardens; however, these statements were previously provided by appellees in response to the plea.

**B.      Interlocutory Appeals**

Section 51.014(a) of the Texas Civil Practice & Remedies Code provides a narrow set of exceptions to the general rule that only final judgments are appealable, *Tex. A & M. Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 841 (Tex. 2007) (citing *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001)), including the grant or denial of a plea to the jurisdiction by a governmental unit, TEX. CIV. PRAC. & REM. CODE ANN. § 54.014(a)(8), regardless of the procedural vehicle used to make the jurisdictional challenge. *See Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006) (concluding that a motion for summary judgment challenging the trial court's subject matter jurisdiction is subsumed under § 54.014(a)(8)).

Although § 54.014(a) does not expressly limit a party to one interlocutory appeal, the right to successive interlocutory appeals is not without limits. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 789 (Tex. 2019). To invoke a court of appeals' interlocutory jurisdiction, the governmental unit must file its notice of appeal within twenty days after the challenged order is signed. *See* TEX. R. APP. P. 26.1(b) (establishing a twenty-day deadline for accelerated appeals); *id.* R. 28.1(a) (defining accelerated appeals to include appeals from interlocutory orders).

Consistent with § 54.014(a)'s purpose of promoting judicial economy, when a party fails to timely appeal the denial of a plea to the jurisdiction, the court of appeals cannot entertain a second challenge to the trial court's jurisdiction that merely constitutes a motion to reconsider the first challenge. *City of Houston v. Estate of Jones*, 388 S.W.3d 663, 667 (Tex. 2007) (per curiam). "Permitting appeals under circumstances such as

14

these would effectively eliminate the requirement that appeals from interlocutory orders must be filed within twenty days after the challenged order is signed." *Id.* (citing TEX. R. APP. P. 26.1(b), 28.1); *see In re K.A.F.*, 160 S.W.3d 923, 925 (Tex. 2005) ("[T]he language of rule 26.1(b) is clear and contains no exceptions to the twenty-day deadline.").

To reset the appellate clock, any subsequent jurisdictional challenge must be "new and distinct." *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017) (per curiam) (citing *Estate of Jones*, 388 S.W.3d at 667). In making this determination, a court of appeals should compare both the substance and procedural nature of the two challenges. *Id.* at 301. For example, a plea to the jurisdiction based on the plaintiff's pleading and a subsequent motion for summary judgment based on the existence of jurisdictional facts may be sufficiently distinct even though they rely on the same jurisdictional theories. *Id.*

### III.    ANALYSIS

On our own motion, we asked the parties to file supplemental briefs addressing our jurisdiction over this appeal. *See Garcia v. State Farm Lloyds*, 287 S.W.3d 809, 812 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied) ("Appellate courts are obligated to review *sua sponte* issues affecting jurisdiction." (citing *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004))); *see also Arriaga v. Arriaga*, No. 13-15-00038-CV, 2015 WL 5626189, at *2 (Tex. App.—Corpus Christi–Edinburg 2015, no pet.) (mem. op.). Appellees acknowledge that the plea and motion "are fundamentally the same" but nonetheless ask us to address the merits of the appeal out of concerns for judicial economy. Appellants contend that the motion is "sufficiently distinct" from the plea and

generally point to the additional evidence attached to their motion to demonstrate that the jurisdictional record was more fully developed at the summary judgment stage with respect to their official immunity argument.

While there was certainly more evidence before the trial court when it denied the motion, we disagree that any of it constituted "new evidence" material to the trial court's jurisdictional analysis. *See Smedley*, 533 S.W.3d at 302. Appellants have failed to point us to any specific jurisdictional fact that was established by this additional evidence, as opposed to the evidence before the trial court when it decided the plea, and we have found none. Simply put, the deposition transcripts are redundant; each material fact DPS relied on to support its official immunity argument can be found in either the video,[4] the detailed statements from the five officers, or both. As such, there was no "discovered evidence" for the trial court to consider when it denied the motion for summary judgment. *See id.*

Likewise, the remainder of the jurisdictional issues in the motion were both procedurally and substantively identical to the issues previously presented in the plea. *See id.* at 301. Appellants merely reasserted their previous jurisdictional arguments based on the pleadings and the changed policy.[5] *See id.* Therefore, because the motion for summary judgment constitutes a motion to reconsider the previously denied plea to the jurisdiction and appellants filed their notice of appeal more than twenty days after the trial

---

[4] It is noteworthy that there is a video of the incident and that it is consistent with the troopers' statements. *Cf. Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (holding that video evidence can conclusively establish that an officer is entitled to qualified immunity from an excessive force claim).

[5] DPS's primary argument on appeal is that appellees failed to allege a valid waiver under the TTCA. If correct, then its affirmative defense based on official immunity is unnecessary to the disposition of the case.

court denied the plea, we lack jurisdiction over this appeal. *See Estate of Jones*, 388 S.W.3d at 667; TEX. R. APP. P. 26.1(b), 28.1(a).

Finally, we recognize that our decision is ultimately unsatisfying to both parties, and we are sympathetic to their pleas for judicial economy. We cannot, however, exercise jurisdiction where none exists. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).[6]

### IV.    CONCLUSION

We dismiss the appeal for want of jurisdiction.

GINA M. BENAVIDES
Justice

Delivered and filed on the
3rd day of February, 2022.

---

[6] Of course, appellants had the opportunity to have these jurisdictional questions answered early in the litigation and potentially avoid discovery and trial all together. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(b) (providing for the automatic stay of "all other proceedings in the trial court" during the pendency of an appeal from the denial of a plea to the jurisdiction); *City of Houston v. Estate of Jones*, 388 S.W.3d 663, 667 (Tex. 2007) (per curiam) ("[T]he main purpose of the interlocutory appeal statute . . . is to increase efficiency in the judicial process." (citing *Tex. A & M. Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 845 (Tex. 2007))).