

# NUMBER 13-23-00205-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MARISSA PETERSON,**                                                          **Appellant,**

**v.**

**HEB GROCERY CO., L.P.,**                                                      **Appellee.**

---

## ON APPEAL FROM THE 131ST DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña
Memorandum Opinion by Chief Justice Contreras**

This appeal arises from a summary judgment granted in a slip-and-fall case.

Appellant Marissa Peterson sued appellee HEB Grocery Co., L.P. (HEB[1]) for premises

---

[1] In its appellee's brief, HEB states that it was "incorrectly identified" in the trial court record and its actual name is H-E-B, LP.

liability, and the trial court granted HEB's combined no-evidence and traditional motion for summary judgment and dismissed the case. On appeal, Peterson argues the trial court erred by (1) excluding the testimony of her expert witness, and (2) granting summary judgment in favor of HEB. We reverse and remand.[2]

## I. BACKGROUND

The subject accident occurred on or about September 4, 2016. In her original petition filed on October 11, 2017, Peterson alleged that she was injured when she "slipped and fell on some water that had accumulated on the toy aisle" of an HEB store on San Pedro Avenue in San Antonio. She argued that HEB was liable for her injuries because it knew or should have known about the "unreasonable risk of harm" presented by the wet floor, but failed to make it reasonably safe. Peterson sought actual damages including past and future medical expenses and lost wages.[3]

HEB answered the suit and, on April 8, 2019, it filed a "No Evidence and Traditional Motion for Summary Judgment" arguing in part that: (1) there is no evidence of a roof leak which would have caused water to accumulate on the floor in the toy aisle; (2) there is no evidence that HEB breached any duty it had to Peterson; (3) there is no evidence that HEB had actual or constructive knowledge of the allegedly dangerous condition; and (4) as a matter of law, HEB did not have actual or constructive knowledge of the condition. *See United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800, 802 n.4 (Tex. 2022) (per

---

[2] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. We therefore apply the precedent of that court to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[3] In subsequent amended petitions, Peterson also named Northwoods (San Antonio), LLC, Northwoods Retail Phase III, Ltd., and Barshop & Oles Company, Inc. as defendants. The claims against those defendants were eventually dismissed and they are not parties to this appeal.

curiam) (listing elements of a premises liability action brought by an invitee). In support of its fourth argument, HEB attached deposition testimony from Peterson; from John Wayne, Peterson's friend who accompanied her to the HEB on the day of the accident; from Robert Marquis, the HEB manager who first came to the scene of the accident; and from Kevin Holguin, HEB's corporate safety manager.

In her deposition, Peterson testified Wayne was pushing a cart in the toy aisle and she was walking beside him on his right when she fell. She said she did not remember falling because she "passed out," but she recalled waking up on the floor with water around her, with her dress wet, and with pain in her knee. She saw a puddle on the floor that was approximately six or seven inches in width, and when she looked up, she saw "[l]ittle drops of water" coming "from one of the rafters" on the ceiling. According to Peterson, it had rained earlier in the day but it was not raining at the time she entered the store. She had "no idea" how long the water had been on the floor prior to the time she slipped, but she said there were no warning signs or mats in the area.

Wayne testified in his deposition that, "[n]ot even two or three minutes" after he and Peterson entered the store, Peterson slipped on a puddle of water in the toy aisle which was "probably two feet across" in size. He saw she fell on her knee and was hurt so he went to find a manager. The manager "was very apologetic" and put material down to absorb the water. Wayne said it had been raining for "at least two days" and there were "signs and little white trash cans and buckets up in several places" around the store because of leaks. He said that, in the toy aisle, there were drops of water falling to the floor "about every ten or 15 seconds, probably." However, there were no warning signs in the toy aisle.

3

Peterson filed a response to the summary judgment motion on May 1, 2019, challenging each ground raised by HEB. The response included several pieces of evidence, including surveillance videos from around the time of the accident, an internal HEB incident report, and an expert report authored by Jason T. English, a professional engineering consultant. English opined that the "principal causative factors related to" Peterson's fall "include" HEB's failure to properly maintain the roof, its failure to timely and consistently inspect the area for hazardous conditions, and its failure to ensure the leak was "adequately contain[ed]." English noted in his report that, according to his review of maintenance records, a "roof repair company" had visited the subject HEB location "almost on a monthly basis between November 2015 and December 2016," and "over 170 different areas of the roof" had to be repaired due to leaks. HEB filed a reply to Peterson's response which did not challenge the admissibility of any evidence. The trial court denied HEB's summary judgment motion on May 8, 2019.

On September 3, 2019, HEB filed a second "No Evidence and Traditional Motion for Summary Judgment" making the same arguments as its first motion but attaching additional evidence, including over 1,700 pages of records from Texas Fifth Wall Roofing Systems, Inc., the company which worked on the store's roof in 2015 and 2016; and an expert report by Bruce L. Morris, an engineering and forensics consultant. Based on weather information, roof repair records, aerial photographs, and personal observations, Morris opined that "the roof was in generally good condition" and "there was no evidence that a roof leak existed above the toy aisle" at the time of the accident. Peterson filed a response to the motion which relied in large part on English's analysis but did not include his report, and HEB filed a reply to her response. On September 26, 2019, HEB filed an

"*Daubert/Robinson* Motion to Exclude" English's report and testimony, arguing that his opinions are "based on flawed methodology and reasoning" and are therefore not reliable or admissible under controlling law. English's deposition testimony was attached to the amended motion. After a hearing on October 4, 2019, the trial court granted HEB's second summary judgment motion without stating its grounds. The court did not explicitly rule on HEB's *Daubert/Robinson* motion.

Peterson appealed the summary judgment ruling, and the San Antonio Court of Appeals reversed and remanded. *Peterson v. HEB Grocery Co., L.P.*, No. 04-19-00688-CV, 2020 WL 1931628, at *1–4 (Tex. App.—San Antonio Apr. 22, 2020, pet. denied) (mem. op.). Because HEB did not dispute that Peterson's own testimony raised a fact question on "whether a roof leak existed," *id.* at *2, the Court confined its analysis to whether there was evidence that HEB had actual or constructive knowledge of the allegedly dangerous condition. It concluded that English's report, combined with Peterson's testimony, constituted more than a scintilla of evidence supporting this element of Peterson's claim; therefore, summary judgment was improper. *Id.* at *3.[4] The court did not address the admissibility of English's report.

Following remand, HEB filed an amended *Daubert/Robinson* motion on July 26, 2022, and Peterson filed a response. The trial court granted the amended motion in its

_____

[4] The court concluded that English's report, though not attached to Peterson's response to the second summary judgment motion, was properly considered in the summary judgment analysis. *Peterson v. HEB Grocery Co., L.P.*, No. 04-19-00688-CV, 2020 WL 1931628, at *2 (Tex. App.—San Antonio Apr. 22, 2020, pet. denied) (mem. op.) (noting that "evidence already in the trial court's file may be properly made part of the summary judgment record if the nonmovant . . . incorporates the evidence by reference in her briefs" and that, "by referring in her second summary judgment response to 'the exact same evidence [she] pointed to during the last Motion for Summary Judgment' and explicitly relying upon English's opinions, Peterson 'alert[ed] the court' that she intended to rely upon English's expert report that was previously filed" (cleaned up)).

entirety on August 15, 2022.

HEB then filed a third "No Evidence and Traditional Motion for Summary Judgment" on February 2, 2023. This motion made the same arguments as the first two motions, but it included a new affidavit by Wayne in which he stated, among other things: "I have no idea where the water came from. I assumed the water came from the ceiling but did not see it dripping as if from a leak." Peterson filed a response largely mirroring the responses she filed to the prior two motions, though in accordance with the trial court's earlier ruling, it did not include English's report or deposition testimony. The response did include other supplemental pieces of evidence, including deposition testimony by Samuel J. Coffee, a "Certified Industrial Hygienist" and "Certified Safety Professional" retained by HEB; deposition testimony by Bart Hernandez, corporate representative for the store's property manager; and additional surveillance videos.[5]

After a hearing on March 21, 2023, the trial court granted HEB's third motion for summary judgment without specifying its reasoning, and dismissed the suit.[6] This appeal followed.

## II.    DISCUSSION

### A.    Exclusion of Expert Testimony

By her first issue, Peterson argues the trial court erred by granting HEB's amended

---

[5] HEB filed a reply to Peterson's response which included Morris's report; however, the trial court sustained Peterson's objection to the reply on grounds that it was untimely.

[6] Notably, the four major trial court rulings in the underlying case were made by four different judges. Judge Laura Salinas signed the order denying HEB's first summary judgment motion; Judge Aaron Hass signed the order granting HEB's second summary judgment motion; Judge Cynthia Chapa signed the order granting HEB's amended *Daubert/Robinson* motion; and Judge Tina Torres signed the order granting HEB's third summary judgment motion. Peterson states in her brief that, "[u]nfortunately, in Bexar County the presiding judicial system can at times lend itself to parties getting repeat opportunities to present motions to different judges until they are successful."

motion to exclude English's testimony and report.[7]

### 1.      Applicable Law and Standard of Review

A qualified expert witness "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be "relevant to the issues in the case" and "based upon a reliable foundation." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). The trial court is responsible for making the preliminary determination of whether the proffered testimony meets those standards. *Robinson*, 923 S.W.2d at 556.

When the subject of expert testimony is scientific knowledge, the basis of the testimony must be grounded in accepted scientific methods and procedures. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Robinson*, 923 S.W.2d at 557 ("Scientific evidence which is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation."). "Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702." *Robinson*, 923 S.W.2d at 557. In determining whether the scientific theory or technique underlying expert testimony is sufficiently reliable, courts may consider "many factors," such as:

(1)      the extent to which the theory has been or can be tested;

---

[7] Peterson does not argue that HEB waived its objections to English's report by filing its *Daubert/Robinson* motion only after the first summary judgment order, and/or by failing to obtain a ruling on the motion before the second summary judgment hearing. *See Murray v. Nabors Well Serv.*, 622 S.W.3d 43, 51 (Tex. App.—El Paso 2020, no pet.) ("[O]bjections to the form or contents of an affidavit as summary judgment evidence must be made in writing and ruled upon by the trial court in order to preserve the issue for appeal."). We therefore do not address the issue. *See* TEX. R. APP. P. 47.1.

(2)  the extent to which the technique relies upon the subjective interpretation of the expert . . . ;

(3)  whether the theory has been subjected to peer review and/or publication;

(4)  the technique's potential rate of error;

(5)  whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6)  the non-judicial uses which have been made of the theory or technique.

*Id.* Ultimately, expert testimony will be deemed relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 556. And it will be deemed reliable if it meets the six non-exclusive *Robinson* factors, *see id.* at 557, or "if the trial court can otherwise assess its reliability." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 422 (Tex. 2020) (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001)). But "[i]f an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Helena Chem. Co.*, 47 S.W.3d at 499. Expert testimony is also unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007).

We review a trial court's evidentiary rulings on appeal for abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to guiding rules or principles. *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011) (plurality op.).

**2.  English's Report and Testimony**

English explained in his report that he is a licensed professional engineer and a

"nationally Certified Safety Professional"; holds a Master of Science degree in safety engineering from Texas A&M University; "completed post-graduate study . . . regarding the evaluation and design of means of egress components, to include stairways, ramps, level surfaces, lighting, and code administration"; and has "personally investigated numerous fall incidents in various industries, including pedestrian falls in a commercial retail premises such as in this matter." English's curriculum vitae was attached to the report. The report states that it contains English's "preliminary findings to date regarding" the "injury event" at issue, "specifically outlining the primary causative factors" and "addressing the associated responsibility of the various parties regarding the injury event."

The seventeen-page report begins with a section entitled "Discussion Material" containing a review of "foundational concepts, guidelines, and information based on authoritative published literature" in the field of safety engineering. This section discusses the necessity of having a "proper safety management system" in place in a "public premises environment," including "management commitment and employee involvement; worksite analysis; hazard prevention and control; and training for employees, supervisors and managers." This section cites studies establishing that falls are the leading national cause of unintentional injuries and injury-related hospital emergency room visits.

The report next discusses "human visual characteristics while walking," noting that a person walking at four to five feet per second "actually only see[s] in detail a very limited number of the items 'available to be seen' in their visual field" due to distractions. English explains that "[t]his is why walking surface hazards are often not seen by reasonably prudent people until it is too late, and they are unexpectedly exposed to the hazard and a fall initiates." He also notes that "[w]hen walkway surface conditions encountered are

different from what is expected, the potential for an accident increases."

The report next discusses "walking surface slip resistance." English stated in this section that

> [t]he slip resistance of a walking/working surface is a function of several factors including (a) the type [of] surface material used, to include its surface texture and characteristics of wear (or resistance to wear), (b) the presence of contaminants (liquid or solid), and (c) how such surface is maintained.
>
> Further, the slip resistance of a particular floor area should be uniform, as it is typically the unforeseen or unexpected localized spot that is less slip resistant than the surrounding or adjacent floor.

The remainder of the report contains English's "opinions and conclusions" regarding Peterson's accident. It begins with the following summary:

> In this matter, the principal causative factors related to Ms. Peterson's fall incident include (a) the failure of Defendants to maintain the roof of the HEB store in good condition to prevent the infiltration of water into the building and onto the floor, and until such roof leaks were properly repaired, (b) the failure of HEB to adequately contain the water (by use of containers/catch pans, diverters, liquid containment socks, absorbent socks, etc.) from leaking onto the interior walkway floor surface areas, with the smooth hard surface flooring (polished concrete) inside the HEB of the type that becomes unreasonably slippery in the presence of moisture, and (c) the failure to adequately inspect the area for hazardous conditions on a timely and consistent basis, especially given the ongoing issues with roof leaks, and respond appropriately with effective safeguards and warnings to prevent pedestrian falls.

English then states that "HEB had a responsibil[i]ty to provide a safe premises for their employees and customers, which in this matter required effectively dealing with ongoing roof leaks in their store until such leaks could be adequately repaired" by the property manager or property owner. He elaborates as follows:

> HEB was fully aware of roof leaks during periods of rain on an ongoing basis for at least a year prior to Ms. Peterson's fall, and until such leaks were remedied by whatever means, HEB failed to take adequate precautions to rea[s]onably protect their employees and customers, to include failing to provide adequate equipment and supplies to catch the water to prevent it from getting to the walking surfaces of their store, and failing to provide

adequate training to the store staff at this particular location relative to the specific condition of significant roof leaks with which they must routinely deal. That is, while HEB appears to have had a basic slip & fall program in place, the conditions at the store location in this matter with the ongoing roof leaks was beyond standard conditions a typical store (without ongoing leaks) must deal with, and therefore the policies and procedures at this store location must go beyond basic spill response and floor maintenance to adequately deal with such conditions. This would include specific procedures relative to preparing for inclement weather, such as tracking weather forecasts to ensure adequate staff is scheduled to serve customers and deal with the water leaks (increased inspections, responding to leaks, setting up barricades/warnings, removing water, etc.), implementing an enhanced (increased) inspection program to identify leaks and hazardous floor conditions, providing adequate equipment to catch, contain and remove water from the floors, along with equipment (barricades/warnings) to ensure the hazardous floor areas are fully barricaded to prevent exposing customers to such conditions, and follow-up monitoring of barricaded areas to ensure the hazards are fully contained and not spreading beyond such barricades, warning cones, or catch containers.

Next, the report reviews provisions of various codes and standards relating to floor surfaces, including the International Building Code and International Fire Code, which both require that "[w]alking surfaces of the means of egress shall have a slip-resistant surface and be securely attached." English opines that these regulations apply to the section of the HEB floor at issue in this case.

English explains in his report that, according to his review of Holguin's deposition testimony, "HEB does not incorporate any planned floor safety inspections at any particular intervals, or utilize any sweep logs to document and ensure inspections are timely performed." Instead, Holguin testified that HEB has a "continuous inspection process" in which they "don't specify times of day [for inspections]. It's every day, all the time, wherever you're at." English opines that this constitutes an "incidental inspection program" which may not be sufficient to ensure that aisles are clear of hazards. He states that "[r]elying exclusively on incidental or 'continuous' inspections often results in some spills (or roof leaks) going undetected for extended periods of time." On the other hand,

regularly planned safety inspections are preferable because they are often guided by checklists and documented; they are "the focus of the task for the individual, not secondary to some other task"; and they "create[] an assignment of responsibility and accountability, instead of being 'everybody's responsibility,' which often equates to ultimately being 'nobody's responsibility.'" English states that "[p]lanned and focused safety inspections tend to discover hazards that are often missed during a casual 'walk-by.'"

Finally, English's report describes an experiment that he performed in order to determine the approximate length of time the puddle on the HEB aisle floor had existed at the time of Peterson's fall. It states:

> In this matter, Ms. Peterson's a[c]quaintance that was shopping with her, Mr. Wayne, testified that after the fall, he viewed a water puddle approximately 2 feet or more in diameter, with water splatters from the leak extending beyond the main puddle most of the width of the aisle. In this regard, I used a bottle that produces a consistent and controlled drip to estimate the amount of time it potentially takes to create a puddle of water. Based on my testing, it took 120 water drips to produce 5 ML (milliliters). I then poured the 5ML onto the floor, which produced a puddle approximately 2 inches in diameter. 50ML produced a puddle approximately 7-1/2 inches in diameter, less than a third of the size described by Mr. Wayne. Accordingly, it would take 1,200 drips using the method of my testing to produce only 50 ML. Mr. Wayne testified it was a slow drip, estimating about 1 drip every 15 seconds, which would take 5 hours to produce the 50 ML and only a 7-1/2 inch diameter puddle. Even if Mr. Wayne underestimated the rate of drip, it would take 100 minutes (1.7 hours) to produce 50 ML at a rate of 1 drip every 5 seconds, and 20 minutes at a rate of 1 drip per second. Clearly, the time required to produce a 2 foot diameter puddle would be significantly longer.

The report concludes:

> Based on the amount of water on the floor described by Mr. Wayne, along with additional water required to wet Ms. Peterson's dress as she described, it is my opinion that HEB failed to incorporate an adequate inspection program, especially given the known history of roof leaks as previously described, to reasonably and timely discover the puddle of water on the floor in this matter. Given the ongoing roof leak problem (170 leaks) in at

12

least the prior year,[8] HEB failed to establish[] heightened inspection procedures at this particular store location during times of inclement weather to monitor for roof leaks.

In deposition testimony attached to HEB's *Daubert*/*Robinson* motion, English stated that the type of floor used in the San Pedro HEB is generally safe when it is "in a clean and dry condition," but it becomes unreasonably slippery and unsafe when it is wet. He conceded that he did not personally inspect the floor at the HEB, but stated he could tell from photographs—and based on his twenty-five years of experience in the field of safety engineering—that the floor did not have any special coatings or toppings that would preserve its slip resistance when wet.

### 2. Analysis

There is no dispute that English is qualified to render an expert opinion on the subjects covered in his report. Instead, HEB argued in its amended *Daubert*/*Robinson* motion that English's opinions are not reliable because they are conclusory, unsupported by sufficient data, and not "verif[ied] by any scientific method." HEB contended that the "drip test" in particular was unreliable because it was based on Wayne's testimony regarding the size of the puddle in the toy aisle, even though Wayne was "unsure of the accuracy" of his recollections.

On appeal, Peterson points to a federal district court case in which evidence of a similar "water drip test" was deemed reliable and admissible under *Daubert*. *See Fed. Ins. Co. v. Gen. Elec. Co.*, No. CIV.A 2:08cv156KS-MTP, 2009 WL 4842501 (S.D. Miss. Dec. 9, 2009) (mem. op. & order). In that case, there was a leak in a vessel of liquid

---

[8] We note that, according to English, records showed repairs were done on the HEB's roof "between November 2015 and December 2016," but Peterson's fall took place in September 2016.

helium used to cool a superconducting magnet in an MRI machine. *Id.* at *1. The plaintiff argued that the leak occurred when water collected and froze, blocking a roof vent which was supposed to release helium gas in the event of insufficient cooling, and causing the vessel to become overpressurized when power was lost. *Id.* To dispute the plaintiff's theory that the vent was defectively designed, GE offered an expert report by cryogenic engineer William Einziger, who opined that the vent design was reasonably safe in part because it included a 1/8-inch "weep hole" which "does not allow water to collect in the area" of the vent. *Id.* at *6. As part of his analysis, Einziger conducted a "water drip test" in his laboratory to determine the rate at which a 1/8-inch weep hole can drain water. *Id.* at *8. The plaintiff argued the "water drip test" is "unreliable because it was conducted at laboratory room temperature and does not account for the cold helium gas that was potentially venting" and "therefore bears little resemblance to the actual occurrence" at issue in the lawsuit. *Id.* The court summarily rejected the plaintiff's argument, noting that its "issues with the water drip test can certainly be presented to the jury on cross-examination." *Id.*

In response, HEB points to English's deposition testimony in which he agreed he used a "consistent and controlled drip" in his test, even though "in reality the drip rate probably changed over the period of . . . rain" and "also would depend on how hard it was raining potentially." HEB argues that English "gave no scientific basis for calculating the variable drip rate from historical data about a rainstorm, nor did he assert he made any attempt to do so." Further, HEB contends that English "provides no means to calculate the time that the rainstorm produced a leak or the speed of any such leak at its inception based on Wayne's estimate of the drip rate two hours later."

More generally, HEB argues that the "drip test" was unreliable because English "did not replicate the HEB store's conditions for testing and measurement in a controlled environment." For example, because Peterson estimated the puddle was six to seven inches wide, and Wayne said it was closer to two feet wide, HEB argues English's choice to use a 7.5-inch puddle in his study was "arbitrary." English also stated that, when conducting the "drip test," he poured water from a low height so that "it wouldn't splash"; HEB contends that it is mere speculation for English to attribute the same qualities to a leak from the elevated ceiling of a large supermarket. And HEB notes that, according to English's deposition testimony, the floor on which English conducted his test was tiled and grouted—not polished concrete as was the case in the store.

We agree with HEB that the "drip test" is unreliable. As HEB notes, the test relies on Wayne's recollection in his deposition that there were drops of water falling from the ceiling above the toy aisle "about every ten or 15 seconds," but Wayne later testified in his affidavit that he "ha[s] no idea where the water came from." Accordingly, the ultimate finding of the "drip test"—that it could take up to five hours for a fifty-milliliter puddle to form, *given Wayne's observed drip rate*—is irrelevant to the elements of premises liability as alleged in Peterson's lawsuit. Even if one were to credit Wayne's deposition testimony and disregard his recantation, English's "drip test" would be unreliable because it depends on an assumption that an individual drop of water from a small plastic bottle is equivalent in volume to an individual drop of water falling from the ceiling of a supermarket after a rainstorm. There is nothing in the record suggesting that all "water drops" are created equal. Because of these analytical gaps, the "drip test" would not assist the jury in determining the length of time the water had been on the floor at the time of Peterson's

fall. We cannot conclude the trial court abused its discretion in excluding evidence of the "drip test."[9]

We next address the other elements of English's report which were excluded by the trial court's order, including his conclusions that: (1) the floor of the HEB at issue was unreasonably dangerous because it was wet at the time of Peterson's fall; (2) HEB failed to adequately maintain the roof, inspect the floor, and contain the leak; and (3) those failures were among the "principal causative factors" involved in Peterson's fall.

In its *Daubert*/*Robinson* motion, HEB cited *Dietz v. Hill Country Restaurants, Inc.*, 398 S.W.3d 761 (Tex. App.—San Antonio 2011, no pet.), another slip-and-fall case in which the trial court excluded English's testimony. In that case, English "explained the various factors that contribute to falls on a walking surface, . . . identified several construction codes and standards pertaining to walking surfaces," and opined that "the primary unsafe condition" which caused the plaintiff's injury "was the presence of an uneven concrete walkway surface with numerous depressions (holes)." *Id.* at 764. The plaintiff argued the trial court abused its discretion by excluding English's opinions because he "would have provided specialized knowledge of the human visual field and musculoskeletal system during the walking process" and "would have explained why it was not only possible but prudent for [defendant] to identify, evaluate, and control the hazard before someone like [plaintiff] fell." *Id.* The San Antonio court of appeals

---

[9] The "water drip test" in *Federal Insurance Co.* is similar in that it also failed to precisely replicate the conditions of the injury-causing event. *See Fed. Ins. Co. v. Gen. Elec. Co.*, No. CIV.A 2:08cv156KS-MTP, 2009 WL 4842501 (S.D. Miss. Dec. 9, 2009) (mem. op. & order). However, as an unpublished decision from a federal district court, *Federal Insurance Co.* is not binding on this Court. *See In re Gamble*, 676 S.W.3d 760, 805 (Tex. App.—Fort Worth 2023, orig. proceeding). Even if it were, the fact that it was not an abuse of discretion to admit the "water drip test" in that case does not necessarily mean it was an abuse of discretion to exclude English's test here.

disagreed, finding that "the trial court could have reasonably concluded English's opinion would not assist a jury in determining if the condition of the walkway posed an unreasonable risk of harm." *Id.* at 765–66. The court noted that a jury would be able to observe photographs and hear testimony about prior falls or complaints about the walkway surface, and from that evidence, it "would have been able to form its own conclusion about whether the walkway posed an unreasonable risk of harm." *Id.* at 766 (citing *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 361 (Tex. 2000)).[10]

Peterson argues the case is more akin to *Barrera v. HEB Grocery Co., L.P.*, No. 04-15-00152-CV, 2016 WL 4013821 (Tex. App.—San Antonio July 27, 2016, no pet.) (mem. op.), yet another slip-and-fall case involving English's expert testimony. There, the trial court granted HEB's motion for partial summary judgment which argued, among other things, that its floor was "not a dangerous condition" under wet or dry conditions. *Id.* at *1–2. HEB then filed a motion in limine arguing that, in light of the partial summary judgment ruling, the plaintiff should "not be allowed to make any arguments or any references or any comments [about HEB's] floors." *Id.* at 2. The trial court denied the motion in limine and, at trial, it "permitted English to testify about applicable slip-resistance standards, the tests he conducted on HEB's floor under both wet and dry conditions, and whether the results showed the floor tested below safety standards for slip resistance." *Id.* The court of appeals held that, even if the partial summary judgment order was erroneous, the error was harmless because the trial court permitted the plaintiff to

---

[10] HEB also contrasts this case with *Broussard v. Omni Hotels Corp.*, No. 13-18-00277-CV, 2019 WL 4309574 (Tex. App.—Corpus Christi–Edinburg Sept. 12, 2019, no pet.) (mem. op.), in which English testified in support of the plaintiff's claim that an underlit stairway caused her to fall and suffer injury. There, English visited the site of the fall and took light measurements from the actual stairway at issue. *See id.* at *1. But the admissibility of English's testimony was not in dispute in that case. *See id.*

17

introduce evidence, including English's testimony, "that HEB's floor, when wet, falls below applicable standards for reasonably safe slip resistance" and is unreasonably dangerous. *Id.* at *3. HEB argues *Barrera* is distinguishable because English used the actual floor at issue to do his test in that case, although that is not clearly apparent from the court's opinion. In any event, the *Barrera* court did not review the trial court's motion in limine ruling, nor did it otherwise rule upon the relevance or reliability of English's testimony. *See id.* Accordingly, we find it of minimal utility in addressing the issue before us.

On appeal, HEB argues that whether "a concrete floor becomes slippery when wet is within a factfinder's common knowledge," and therefore, English's opinion in this regard was properly excluded. *See Honeycutt*, 24 S.W.3d at 360 ("When the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony."). We agree. English testified that certain floor surfaces, such as "broom-finished concrete," do not become unreasonably dangerous when they are wet. However, it is undisputed that the floor at issue in this case consisted of polished concrete. As in *Dietz*, the jury would be able to view objective evidence such as photographs and would be "equally competent" as English to opine about the level of danger presented by a wet polished concrete floor. *See* 398 S.W.3d at 766. The trial court was within its discretion to exclude this testimony.

The analysis differs with respect to English's opinions that HEB failed in its duties to maintain the roof, inspect the floor, and contain the leak. HEB argued in its *Daubert/Robinson* motion that these opinions were conclusory, but we disagree. As noted, it is undisputed that English is qualified by experience to render expert opinions in

18

his areas of specialty, and his opinions as to HEB's failures were based on that experience. Moreover, his opinions in this regard were not merely *ipse dixit*—instead, they were based on objective rules and standards which English stated, according to his experience, were applicable to the floor at issue. Though English did not personally inspect the floor of the HEB, the basic physical characteristics of the floor were not in dispute. To the extent HEB also argued that English's opinions were inadmissible under Rule 702 because they were irrelevant, the trial court erred if it based its ruling on those grounds—English's opinion regarding whether HEB complied with its duties to reasonably reduce or eliminate the risk of harm presented by a wet floor is directly relevant to an essential element of Peterson's premises liability claim. *See United Supermarkets, LLC*, 646 S.W.3d at 802 n.4 (noting that, to prove a premises liability claim, an invitee must show, among other elements, that the owner did not exercise reasonable care to reduce or eliminate the unreasonable risk of harm). We conclude the trial court abused its discretion in excluding English's expert opinion testimony that HEB failed to adequately maintain the roof, inspect the floor, and contain the leak.

Peterson's first issue is sustained in part and overruled in part.

## B. Summary Judgment

By her second issue on appeal, Peterson argues the trial court erred in granting HEB's third summary judgment motion.

### 1. Applicable Law and Standard of Review

A summary judgment motion may be brought on traditional or no-evidence grounds. *See* TEX. R. CIV. P. 166a. A movant for traditional summary judgment has the burden to establish that no genuine issue of a material fact exists and that it is entitled to

19

judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). A movant for no-evidence summary judgment must show that, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the other party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i).

If, in response to a summary judgment motion, the non-movant produces more than a scintilla of evidence to raise a fact issue on the challenged elements, then summary judgment is improper. *Amedisys, Inc.*, 437 S.W.3d at 511; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010).

We review summary judgments de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). The evidence is viewed in the light most favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts against the motion. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009). "Issues not expressly presented to the trial court by written motion, answer[,] or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c).

### 2. Premises Liability

To prevail on a premises liability claim against a property owner, an injured invitee

20

must establish four elements: (1) the owner had actual or constructive knowledge of the condition at issue; (2) the condition was unreasonably dangerous; (3) the owner did not exercise reasonable care to reduce or eliminate the unreasonable risk of harm; and (4) the owner's failure to reduce or eliminate the unreasonable risk of harm proximately caused the plaintiff's injuries. *United Supermarkets, LLC*, 646 S.W.3d at 802 n.4. To demonstrate actual or constructive knowledge in a slip-and-fall case, the plaintiff must establish that: "(1) the defendant placed the substance on the floor, (2) the defendant actually knew that the substance was on the floor, or (3) it is more likely than not that the condition existed long enough to give the premises owner a reasonable opportunity to discover it." *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002).

Constructive knowledge of a condition can be established by evidence of employees' proximity to the condition, the conspicuity of the condition, or the longevity of the condition. *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 567–68 (Tex. 2006) (per curiam); *Reece*, 81 S.W.3d at 814. Evidence of longevity—i.e., the length of time the condition existed prior to the accident—"best indicates" whether the defendant had a reasonable opportunity to discover and remedy the dangerous condition. *Reece*, 81 S.W.3d at 816; *see CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 102–03 (Tex. 2000) (noting that constructive knowledge may be shown by evidence that the condition had "existed long enough for the owner or occupier to have discovered it upon reasonable inspection"). "What constitutes a reasonable time for a premises owner to discover a dangerous condition will, of course, vary depending upon the facts and circumstances presented." *Reece*, 81 S.W.3d at 816.

As the San Antonio court of appeals noted, "evidence that a puddle or spill

21

appeared to have been tread upon" is insufficient by itself to show how long the condition existed. *Peterson*, 2020 WL 1931628, at *3 (first citing *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936–37 (Tex. 1998); and then citing *H.E. Butt Grocery Co. v. Rivera*, No. 04-02-00882-CV, 2003 WL 23093648, at *4 (Tex. App.—San Antonio Dec. 31, 2003, pet. denied) (mem. op.)). That is because evidence equally supporting two conflicting inferences is "no evidence" supporting either inference. *See id.* (citing *Rivera*, 2003 WL 23093648, at *4 ("The presence of footprints in the water equally supports the inference that the tracks were of recent origin as it supports the inference that they had been there a long time. Thus, this testimony too is no evidence of constructive notice.")).

### 3. Analysis

In its third summary judgment motion, HEB argued (1) there was no evidence it had actual or constructive knowledge of any dangerous condition, and (2) it had no actual or constructive knowledge of any dangerous condition as a matter of law.[11] Because the trial court did not specify the basis for its ruling, we must affirm the judgment if any theory advanced in the motion is meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

In 2020, the San Antonio Court of Appeals held that the summary judgment evidence on file at that time was sufficient to raise a fact issue on the question of whether HEB had constructive knowledge of the puddle on which Peterson slipped. *Peterson*, 2020 WL 1931628, at *3. That evidence included English's testimony about "the length of time it would have taken for the puddle Peterson slipped on to form"; Peterson's testimony

---

[11] HEB's third summary judgment motion also argued there was no evidence it "breached any duty of care that led to [Peterson] sustaining an injury," but only "because there is no evidence the condition was known or reasonably discoverable." HEB does not mention the breach element in its appellee's brief.

that "it had rained earlier on the day of her fall"; and HEB's internal incident report which "identified the substance involved as 'water' and the substance origin as 'rain.'" *Id.* *3. The court concluded that, when taken together, this constituted "more than a scintilla of evidence HEB had a reasonable opportunity to discover and remedy the dangerous condition between the rain event and Peterson's fall." *Id.*

The evidence before the trial court at the time of HEB's third summary judgment motion included all of the evidence considered by the San Antonio court in 2020 aside from English's report, which the trial court excluded. Peterson argues that, aside from English's report and testimony, there was more than a scintilla of evidence that HEB had constructive knowledge of the puddle.[12] Specifically, she points to the incident report and roofing company records, as well as deposition testimony by Hernandez that, since a "major renovation" at the San Pedro HEB in 2015, he has received reports of leaks there "every time it rains." She also points to Marquis's deposition testimony agreeing that employees "walk the stores more frequently in the event of a rainstorm." Finally, she notes that, according to the surveillance videos attached to her response to the third summary judgment motion, it rained from 7:00 to 7:30 p.m. but no HEB employees checked the toy aisle in the time between the end of the storm and Peterson's fall at approximately 9:30 p.m.

Peterson cites *Wal-Mart Stores, Inc. v. Tinsley*, where the Texarkana Court of Appeals held the evidence was sufficient to establish the property owner's constructive

---

[12] We have already found that, though the trial court did not err in excluding evidence of English's "drip test" or his opinion that a polished concrete floor becomes unreasonably dangerous when wet, it did err in excluding English's opinions that HEB failed to adequately maintain the roof, inspect the floor, and contain the leak. Although the trial court did not consider any of English's report or testimony in making its summary judgment ruling, we will consider the parts of his report and testimony which were erroneously excluded, in the interest of judicial economy.

knowledge of a dangerous condition. 998 S.W.2d 664, 669 (Tex. App.—Texarkana 1999, pet. denied); *see Peterson*, 2020 WL 1931628, at *3 (citing *Tinsley*). In *Tinsley*, the plaintiff testified she slipped in "a pretty good sized puddle" such that "probably three quarters of her body was lying in water." 998 S.W.2d at 668. A department manager testified that "the source of the dripping water was condensation on pipes from the air-conditioning system," that water would leak through ceiling tiles, and that the "size of the puddle on the floor would indicate how long the water had been dripping." *Id.* at 669. The court held that, because the plaintiff testified the puddle was large, and because there was "no evidence that any leak was sudden or of a large quantity at any time," then there was "more than a mere possibility that the water was on the floor long enough for Wal-Mart employees to have discovered the puddle." *Id.*

In response, HEB argues that "[t]estimony about the existence and size of a puddle, in itself, does not establish more than a possibility that water existed on the floor long enough to provide a reasonable opportunity to discover it." It cites several slip-and-fall cases in which the evidence showed substances had accumulated over time, but did not show it was more likely than not that the substance had been on the floor long enough for the defendant to discover it with the use of reasonable care. *See Gonzalez*, 968 S.W.2d at 936 (holding testimony that spilled food "had footprints and cart track marks in it and 'seemed like it had been there a while'" is no evidence that the food "had been on the floor long enough" to show constructive knowledge); *H.E. Butt Grocery Store v. Hamilton*, 632 S.W.2d 189, 191 (Tex. App.—Corpus Christi 1982, no writ) (same where plaintiff testified that "grapes appeared to have been stepped on because juice had come out from many of them"); *Kimbell, Inc. v. Roberson*, 570 S.W.2d 587, 588 (Tex. App.—

24

Tyler 1978, no writ) (same where plaintiff testified that "after he fell, he observed two or three other sets of grocery cart tracks which had passed over the substance"); *Kimbell, Inc. v. Blount*, 562 S.W.2d 10, 12 (Tex. App.—Austin 1978, no writ) (same where witness testified the puddle was "about six to eight feet in length" and there were "footprints and cart tracks extending from the puddle for a distance in several directions, some of which . . . were beginning to get faint"); *see also Rivera*, 2003 WL 23093648, at *1 (same where witness testified there were "stains of shoe marks" in the puddle on which plaintiff slipped). HEB contrasts these cases with others in which additional evidence, aside from the mere existence and size of a puddle, was offered. *See Strunk v. Belt Line Rd. Realty Co.*, 225 S.W.3d 91, 100 (Tex. App.—El Paso 2005, no pet.) (holding there was a fact issue on constructive knowledge where evidence showed there was algae which "needed a minimum of four days to grow" in the puddle in which plaintiff fell); *Kofahl v. Randall's Food & Drugs, Inc.*, 151 S.W.3d 679, 681 (Tex. App.—Waco 2004, pet. denied) (same where plaintiff testified "that the edges of the 'large' puddle of liquid she slipped in were 'very tacky and gummy' as if the puddle was 'starting to dry up'"); *Furr's, Inc. v. Bolton*, 333 S.W.2d 688, 690 (Tex. App.—El Paso 1960, no writ) (same where evidence showed puddle of grape juice "had begun to dry around the edges"); *Kroger Stores, Inc. v. Hernandez*, 549 S.W.2d 16, 17 (Tex. App.—Dallas 1977, no writ) (same where plaintiff testified substance he slipped on was "already dried where it looks like cake"); *Furr's, Inc. v. McCaslin*, 335 S.W.2d 284, 285 (Tex. App.—El Paso 1960, no writ) (same where testimony showed substance was semi-liquid and had "begun to dry on the floor around the edges").

Considering this authority, we conclude that Peterson produced more than a

scintilla of evidence showing that, with the use of reasonable care, HEB should have known about the puddle in the toy aisle prior to Peterson's fall. Wayne and Peterson both testified that there was a puddle on the floor where she slipped, and Peterson saw drops of water falling on to the floor after the accident. Peterson said the puddle was about six or seven inches in width, while Wayne said the puddle was around two feet in width.[13] We agree with HEB that testimony about the existence and size of a puddle, alone, does not establish that it is more likely than not that the puddle had existed for an extended period of time. And there is no evidence here that the puddle had begun to dry or had algae forming in it, as in the cases cited by HEB which found evidence of constructive knowledge. *See Strunk*, 225 S.W.3d at 100 *Kofahl*, 151 S.W.3d at 681; *Bolton*, 333 S.W.2d at 690; *Hernandez*, 549 S.W.2d at 17; *McCaslin*, 335 S.W.2d at 285. Nevertheless, the physical appearance of the puddle itself is not the only type of evidence which may indicate that the puddle existed on the floor for an extended period of time. Here, in addition to the testimony about water existing on the floor at the time of Peterson's fall, evidence established that this particular HEB location underwent frequent and extensive roof repairs in the months leading up to the incident and that, since a major renovation a year before the accident, water leaked from the ceiling "every time it rains." Surveillance videos and witness testimony showed that it was raining on the day in question, but crucially, the rain stopped around two hours prior to Peterson's fall. The cases cited by HEB which found no evidence of constructive knowledge do not involve similar facts. *See Gonzalez*, 968 S.W.2d at 936; *Hamilton*, 632 S.W.2d at 191; *Roberson*,

---

[13] Wayne later recanted his testimony that he saw water dripping from the ceiling, but he did not recant his testimony about the size of the puddle.

26

570 S.W.2d at 588; *Blount*, 562 S.W.2d 10, 12; *see also Rivera*, 2003 WL 23093648, at *1. Even without English's "drip test," a trier of fact could reasonably conclude from all of these circumstances, taken together, that it is more likely than not that the puddle existed for a long enough period of time that HEB, with the exercise of reasonable care, should have known about it prior to Peterson's fall.

Citing *City of San Antonio v. Rodriguez*, 931 S.W.2d 535, 536 (Tex. 1996), HEB argues that "[m]ere knowledge that rain has caused prior roof leaks is not sufficient to establish constructive knowledge" of a dangerous condition. In *Rodriguez*, where the plaintiff slipped and injured himself at a City-owned recreation center, the City conceded it knew of leaks in the roof but disputed whether it "knew of the water on the floor at the time" of the accident. *Id.* at 536. The court of appeals found that the City's knowledge of a dangerous condition was conclusively established, but the Texas Supreme Court disagreed, noting: "The leaky roof was not itself a dangerous condition; it could only cause a dangerous condition. The City was not required to warn of leaks in the roof or repair them; it was required only to prevent the water that leaked through the roof from causing a dangerous condition." *Id.* The Court therefore held that, "[o]n retrial, the jury should be instructed that the allegedly dangerous condition was the water Rodriguez claims was on the floor." *Id.* at 536–37.

It is true that, to establish her premises liability claim at trial, Peterson will have the burden to prove HEB should have known about the water existing on the floor, not merely about leaks in the ceiling. *See id.* However, the frequency and severity of prior leaks is a circumstance which may be considered in determining whether HEB should have reasonably known about the puddle on which Peterson slipped. The *Rodriguez* Court

27

acknowledged as much when it rejected the City's argument that there was "no evidence that it knew of the water on the floor." *Id.* at 537. It reasoned that there was "evidence that the person in charge of the recreation center knew of the leaks in the roof and knew that it had been raining." *Id.* ("Depending on the position of the leaks above the floor and the amount of rain, the jury might have inferred that the person in charge knew that there would be water on the floor."). Under *Rodriguez*, constructive knowledge of a puddle may be inferred from evidence of prior leaks and recent rain in certain circumstances. *See id.*

HEB further cites *Coward v. H.E.B., Inc.*, No. 01-13-00773-CV, 2014 WL 3512800, at *4 (Tex. App.—Houston [1st Dist.] July 15, 2014, no pet.) (mem. op.), in which the evidence showed a store manager "knew that it was raining" and that "the store roof had prior leaks when it rained," but the court of appeals held this was alone insufficient to show HEB's constructive knowledge of a dangerous condition. *Id.* The court reached this conclusion in part because the plaintiff "presented no evidence that would suggest that there had been prior leaks *in the same area of the store where she fell*." *Id.* at *5 (emphasis added) (citing *Rodriguez*, 931 S.W.2d at 537 (noting that a jury may infer constructive knowledge of a puddle resulting from leaks "[d]epending on the position of the leaks above the floor and the amount of rain")). Instead, the evidence "indicated that the prior leaks were located in different parts of the store and were not always the result of rain." *Id.* HEB observes that, according to its review of the voluminous roofing records in evidence in this case, none of the roof repairs were done to remedy leaks over the toy aisle specifically.[14] It therefore argues that, under *Rodriguez* and *Coward*, the extensive

---

[14] Neither party cites any specific part of the 1,700-plus-page roofing record exhibit. However, Peterson does not dispute HEB's characterization of the records.

28

roof repairs in the months leading up to the accident are not probative of its constructive knowledge of water on the floor where Peterson slipped.

We disagree that evidence of prior leaks *over the toy aisle in particular* was necessary to survive summary judgment under these circumstances. In *Rodriguez*, the Court observed that "the position of the leaks above the floor" would be relevant to the constructive knowledge question, but it rejected the City's no-evidence argument even without specifying any such evidence. *Rodriguez*, 931 S.W.2d at 537. The only evidence referred to by the Court was "that the person in charge of the recreation center knew of the leaks in the roof and knew that it had been raining," and that was enough to defeat a no-evidence complaint. *Id.* We therefore do not read *Rodriguez* as requiring, in cases where evidence of prior leaks is introduced to show constructive knowledge of a puddle, that the prior leaks be in exactly the same place as the puddle. And we decline to follow *Coward* to the extent it construes *Rodriguez* in that manner.

In any event, *Coward* is factually distinguishable from the instant case. Unlike here, the evidence in *Coward* showed that the prior leaks were "not always the result of rain," 2014 WL 3512800, at *5—thus, there, it would not be reasonable to infer constructive knowledge of water on the floor from the mere fact that it had recently rained. Moreover, there was no evidence in *Coward* that two hours had elapsed between the time of the last rainfall and the plaintiff's slip.[15] This "temporal evidence," when combined with the

---

[15] HEB also cites *City of Dallas v. Papierski*, in which the court of appeals held there was no evidence of the City's constructive knowledge of water on the convention center arena ramp on which the plaintiff slipped and fell. No. 05-17-00157-CV, 2017 WL 4349174, at *6–7 (Tex. App.—Dallas Oct. 2, 2017, no pet.) (mem. op.). There, the plaintiff "could not remember if her hands or clothes were wet" after her fall but there was testimony that there were leaks "everywhere" in the convention center. *Id.* at *6. The court held that "[t]he fact that other areas of the Convention Center had leaks does not provide the necessary temporal evidence to establish the puddle was present on the arena ramp long enough to create a fact issue regarding the City's constructive knowledge of the dangerous condition at the time [the plaintiff] fell."

evidence of recent extensive roof repairs throughout the store, could lead a reasonable and fair-minded juror to conclude that HEB should have known about the puddle of water in the toy aisle.

For the foregoing reasons, we conclude that there was more than a scintilla of evidence of HEB's constructive knowledge of the dangerous condition. And, HEB's summary judgment evidence did not conclusively establish its lack of constructive knowledge. Accordingly, fact issues remain for the jury to decide, and the trial court erred in granting summary judgment in favor of HEB. *See* TEX. R. CIV. P. 166a(c), (i). We sustain Peterson's second issue.

### III.    CONCLUSION

The trial court's judgment is reversed and we remand for further proceedings consistent with this memorandum opinion.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
21st day of March, 2024.

---

*Id.* Like *Coward*, this case is factually distinguishable because there was no evidence that a substantial period of time had elapsed between the last rainfall and the accident. Moreover, there was no evidence in *Papierski* that rain caused the leak which resulted in the puddle on which the plaintiff slipped.